**BAUER v. CLARK.**

No. 9162.

Circuit Court of Appeals, Seventh Circuit.

Feb. 15, 1947.

Rehearing Denied April 1, 1947.

Jay J. McCarthy, of Chicago, Ill., for appellant.

B. Howard Caughran, U. S. Atty., of Indianapolis, Ind., Robert L. Werner and John Ford Baecher, Sp. Assts. to Atty. Gen., John F. Sonnett, Asst. Atty. Gen., and Ray B. Houston and William Jordan, Jr.,

Attys., Department of Justice, both of New York City, for appellee.

Before SPARKS, MAJOR, and MINTON, Circuit Judges.

MAJOR, Circuit Judge.

This appeal is from an order entered by the District Court on May 17, 1946, dismissing plaintiff's complaint in a suit predicated upon Section 903, Title 8 U.S.C.A., entitled "Judicial proceedings for declaration of United States nationality in event of denial of rights and privileges as national."

Section 903 provides: "If any person who claims a right or privilege as a national of the United States is denied such right or privilege by any Department or agency, or executive official thereof, upon the ground that he is not a national of the United States, such person, regardless of whether he is within the United States or abroad, may institute an action against the head of such Department or agency in * * * the district court of the United States for the district in which such person claims a permanent residence for a judgment declaring him to be a national of the United States."

The complaint, filed January 22, 1946, alleged so far as here material that the permanent residence of plaintiff was in the City of Indianapolis, Marion County, State of Indiana, and that he was a citizen of the United States of America by virtue of a decree of naturalization duly entered by the Supreme Court of the District of Columbia on October 1, 1935, pursuant to which decree a certificate of citizenship was issued to him on October 1, 1935. A certificate of such citizenship was attached to and made a part of the complaint. It alleged that said decree and certificate of citizenship had never been revoked, rescinded or cancelled, nor had any action ever been commenced for such purpose, and that by virtue of such citizenship plaintiff was entitled to and claimed the right and privilege to reside in the United States.

The complaint further alleged that the defendant in his capacity as Attorney General and as the executive officer of the Department of Justice of the United States had disputed and denied plaintiff certain of

his rights and privileges as a citizen and national of the United States in the following manner: That upon plaintiff's discharge from service as a soldier in the United States Army, agents of the said defendant took him into custody and issued what it termed an order of internment, erroneously proclaiming that plaintiff was an enemy alien and a native citizen or subject of Germany and that plaintiff had been interned and was being held as a prisoner on Ellis Island, a place designated and used by the government of the United States as an exodus point from which enemy and other aliens are deported from this country. The complaint also alleged in substance that defendant was threatening to rescind and revoke plaintiff's citizenship and deport him from the United States, in contravention and denial of his rights and privileges as a citizen. The complaint concluded by praying, among other things, that plaintiff be produced in court, that a hearing be had and that "his said citizenship as a National of the United States of America be confirmed and ratified."

On March 21, 1946, defendant answered the complaint and, so far as here material, admitted that plaintiff became a citizen of the United States by naturalization at the time and place alleged in the complaint and that no judicial proceedings had ever been commenced for the purpose of setting aside said decree of naturalization, but that plaintiff on November 4, 1938 returned to Germany, that he entered the German Army in June 1940, that he had expatriated himself and lost his nationality and citizenship by virtue of taking an oath of allegiance to Adolph Hitler, then Fuehrer of the German Reich, during or about June 1940, and that he was an alien enemy. The answer also admitted that the defendant in his official capacity had withheld from plaintiff certain rights and privileges and that he was being detained as alleged in the complaint. The answer prayed that the judgment sought by plaintiff be denied and that a judgment be entered declaring that plaintiff ceased to be a citizen of the United States upon his taking the oath of allegiance to Germany. On May 17, 1946, defendant filed an amendment to his answer in which he further alleged that plaintiff lost his United States nationality by obtaining naturalization in a foreign state, to wit, the Third German Reich, upon his application on or about June 1940.

Upon this state of the pleadings the cause came for trial before Honorable Walter C. Lindley, specially assigned to hear and decide the case. At the hearing plaintiff, so far as the record discloses, was represented by counsel of his own choosing. The court at the conclusion of the trial rendered an oral opinion which it expressly adopted as its findings of fact and conclusions of law, and on May 17, 1946 entered the order appealed from, dismissing the complaint "for lack of equity." Upon plaintiff's application, he was permitted to prosecute his appeal in forma pauperis, printing of the record was dispensed with, and this court appointed as counsel for the plaintiff for the purpose of perfecting and presenting plaintiff's appeal to this court Honorable Jay J. McCarthy, a prominent member of the Chicago Bar. In this connection we think it appropriate that we express our appreciation for the ability, earnestness and diligence displayed by this court-appointed counsel.

The contention most seriously urged on this appeal is that the findings made by the trial court are not justified by the record. It is also contended that the court erred in the admission of evidence, that the judgment is erroneous because based upon an ex post facto law, and that plaintiff in no event is a national of Germany but one of France. Closely related to the contention that the findings of the court are not substantially supported is the argument that the court erroneously placed the burden of proof upon the plaintiff. In fact, a large portion of plaintiff's brief is devoted to this phase of his argument. This contention of plaintiff is predicated upon the following statement contained in the opinion of the trial Judge:

"Now, I have heard this evidence. I have observed the demeanor of the witnesses on the witness stand. I must confess that I have had a good deal of sympathy for the plaintiff in some respects in certain parts of his story. But I think upon a resolution of all this evidence, remembering that the burden of proof is upon the plaintiff to prove his case by a preponderance of the

evidence, that I cannot put the stamp of approval, the stamp of probity, the stamp of truthfulness upon his testimony."

■ In response to plaintiff's contention as to the burden of proof, defendant argues (1) that the burden is upon the plaintiff because the suit was instituted by him, and (2) the language quoted from the trial Judge's opinion did not relate to any of the expatriating acts relied upon by the government but only to asserted facts advanced by the plaintiff to excuse and avoid the consequences of such acts, that is, that he committed such acts as a result of duress. There may be some basis for the defendant's latter contention but we must admit that we are unable to say that the court thus limited its conclusion that the "burden of proof is upon the plaintiff." In fact, we think it more likely that plaintiff's appraisement of the court's statement is correct.

We have examined the cases cited by the defendant in support of his contention that the burden of proof is upon the plaintiff. We find them not in point. In fact, there is no case, so far as we are aware, which has discussed or decided where the burden lies in a case of the instant character. There are cases which have discussed the matter in suits brought under the general declaratory judgment Act, Sec. 400, Title 28 U.S.C.A., Judicial Code Sec. 274d, and we see no reason why the same rule should not apply in the instant case. It has been held that a suit of the instant character may also be maintained under the general declaratory judgment Act. Ginn v. Biddle, D.C., 60 F.Supp. 530. See also Perkins v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320.

■ Of the numerous authorities which we have examined, we think the rule is best stated in Reliance Life Ins. Co. v. Burgess, 8 Cir., 112 F.2d 234, certiorari denied 311 U.S. 699, 61 S.Ct. 137, 85 L.Ed. 453, wherein the court, in discussing the burden of proof in a declaratory judgment suit, stated, 112 F.2d at page 237:

"The question as to whether the burden of proof in its primary sense rests upon the plaintiff or defendant is ordinarily to be determined by ascertaining from the pleadings which of the parties without evidence would be compelled to submit to an adverse judgment before the introduction of any evidence. It is a fundamental rule that the burden of proof in its primary sense rests upon the party who, as determined by the pleadings, asserts the affirmative of an issue and it remains there until the termination of the action. It is generally upon the party who will be defeated if no evidence relating to the issue is given on either side." (Citing cases.)

■ Applying the rule thus announced to the instant situation, it is pertinent to note the state of the pleadings. As already shown, plaintiff alleged that he was a naturalized citizen and submitted in connection with his complaint his certificate of naturalization. Also, that his rights as such were being interfered with by defendant. The burden of course would have been upon plaintiff to prove such allegations if they had been denied, but they were expressly admitted by defendant in his answer. Such being the case, plaintiff without proof would have been entitled to a judgment. We suppose all would concede that an agency of the government is without authority to interfere with the rights of a citizen, whether he be naturalized or native born, except in a manner authorized by law. Defendant in his answer or otherwise makes no intimation to the contrary but relies upon the affirmative allegations of his answer that plaintiff under the law had by his course of conduct lost or forfeited his rights as a citizen. We think the burden was clearly upon the defendant to establish such affirmative allegations.

Much of the argument as to the burden and measure of proof revolves around the recent decisions of the Supreme Court in Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, and Baumgartner v. United States, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525. Those cases had to do with denaturalization proceedings under Sec. 338 of the Nationality Act of 1940, 8 U.S.C.A. § 738. We have recently, in United States ex rel. Volpe v. Jordan, 7 Cir., 161 F.2d 390, had occasion to consider these cases and to discuss the heavy burden which the Supreme Court has placed upon the government in such a proceeding. Defendant strenuously insists that

the rule as to burden announced by the Supreme Court is inapplicable here. We think the contention is not tenable. Under Sec, 738 (the denaturalization proceeding) the proceeding is to deprive a person who has been naturalized of a privilege which was never rightfully his. Johannessen v. United States, 225 U.S. 227, 238, 32 S.Ct. 613, 56 L.Ed. 1066. In the instant situation, it is conceded that the privilege was rightly bestowed upon the plaintiff but that it had been lost by his subsequent conduct. In one case the government seeks to revoke by showing that the certificate was wrongly issued; in the other it seeks to destroy that which has been legally conferred. Certainly the annihilation of the right is equally disastrous to the person affected in one case as in the other. We think that the government carries the same heavy burden in both situations.

Thus applying the rule announced in the Reliance Life Ins. Co. case, supra, plaintiff would have been entitled to a judgment on the pleadings if no evidence had been introduced. In order to prevent such a result, the burden was clearly upon the government to prove by clear and convincing evidence the affirmative allegations of its answer in order to show a forfeiture or loss of the rights which defendant by his answer conceded had been conferred upon plaintiff by reason of his naturalization. Plaintiff, however, (a lawyer admitted to practice in many courts) and his trial counsel for some reason undisclosed by the record apparently were not content to let this burden rest where we think the law placed it, but assumed the burden of disproving the affirmative allegations of defendant's answer. In other words, before defendant offered any proof plaintiff took the witness stand and his testimony, including cross examination, covers something over 300 typewritten pages, or more than half the total record. Having thus voluntarily assumed such burden, he is in a poor position to urge on appeal that it should have been carried by the defendant.

We think, however, there is logic in the argument that a mistaken notion by the trier of the facts, whether it be a court or a jury, as to where the burden of proof rests might and perhaps would in a close case spell the difference between findings favorable to one party or the other. If we regarded this case as close on the facts or thought that the findings of the court were of doubtful validity because of insufficient proof, we would feel compelled to give plaintiff the benefit of the doubt and reverse the decree. With the situation thus confronting us, we have read all of the testimony, including the exhibits, which was offered at the trial and we are thoroughly convinced that it was clearly and unmistakably shown that plaintiff by his acts and conduct had forfeited his United States nationality and citizenship. Being thus convinced, we think the decree must be affirmed even though we assume that the case was tried by the parties and by the court upon an erroneous theory as to the burden of proof.

Having thus concluded, we think it proper briefly to relate the more salient facts, realizing that to do so in detail would unduly prolong this opinion. Plaintiff was born on June 26, 1905, at Hagenau, Alsace, at that time a part of Germany. His father was an officer in the German Imperial Army. Plaintiff was educated in the schools of Germany, took up the study of engineering and entered the employment of Siemens-Halske (corresponding to Westinghouse or General Electric in this country), took a special course in automatic telephoning and studied Latin and Greek at the University of Berlin. On March 25, 1930, he came to the United States upon a German passport as a German citizen. Shortly thereafter, he was employed in Washington in various capacities until 1931 when he secured employment as a law clerk, translator and draftsman with a firm of patent attorneys in that city. He was thus employed up to and including 1937, his work consisting in the main of translating German patent applications and letters from German clients of the firm by whom he was employed.

On April 30, 1931, plaintiff filed his declaration of intention to become a United States citizen, stating his place of birth and that he was of German nationality. On June 26, 1935, his petition for United States citizenship was filed, and on October 1 of the same year he received a certificate of

naturalization as a United States citizen before the then Supreme Court of the District of Columbia. In the meantime, plaintiff attended and was graduated from law school, was admitted to the Bar of numerous courts, including the Supreme Court of the United States on October 24, 1938. Plaintiff returned to Germany in July 1936 and was married. In September 1936 he returned to this country with his wife and resumed his work with a patent law firm in Washington. In January 1938 he left the Washington firm and secured a job with a patent lawyer in Norwalk, Connecticut. In the latter part of 1938, he had an offer of a job from the Siemens-Halske firm in Germany, which he accepted.

Plaintiff and his wife returned to Germany in November 1938. At that time he sold everything he had in the United States or shipped it to Germany. His work with Siemens-Halske consisted for the most part of translating American patent applications into German and putting them in proper German form, and similarly translating German patent applications into English. In 1939 he was admitted to the German court as an official interpreter. During this time he frequently participated in public demonstrations honoring Adolf Hitler. On November 4, 1939, he addressed a letter to a friend in Washington, D. C., which manifested a decidedly pro-German attitude and in which he was very lavish in his praise of "our troops," which he admitted on the witness stand referred to those of Germany. Referring to the time he was employed with Siemens-Halske, he was at the trial asked this question, "Didn't you take active steps to regain your German citizenship, and be renaturalized in Germany?" He answered, "I believe I did shortly prior to my entering the German Army." In June 1940 he joined the German Army. Referring to that time, plaintiff was asked, "Didn't you go there (referring to the local police department in Zehlendorf) to take steps to be repatriated as a German citizen?" He answered, "Yes." He was then asked, "And as a matter of fact, you were repatriated as a German citizen, weren't you?" and he answered, "I stated before I received some document to that effect."

Plaintiff was interrogated by the Federal Bureau of Investigation and certain army officials at Fort Benjamin Harrison, Indiana, on October 3, 1945. The information obtained as a result of this examination was reduced to narrative form and introduced during plaintiff's cross examination as defendant's exhibit 15. It is a lengthy document consisting of 36 typewritten pages, each page of which is signed by plaintiff. He admitted at the trial that he was given ample time to read this statement and, as the exhibit shows, made numerous corrections in his own handwriting. In this statement his early career in the German Army was described by him as follows:

"The next step that followed was my induction into the German Army, which occurred a very few days after the occupation of Paris by the Germans in the early part of June 1, 1940. I was inducted into the German Army under the name of Frederick E. Bauer, and was sworn into the German Army, I believe, at the barracks of the Grenadier Kaserne in the Kaiser Wilhelmstrasse or Kaiser Wilhelmdamm in Berlin-Wilmersdorf. I was furnished with the uniform of an Infantry Private in the German Army and given a Wehrpass, the identification paper of a member of the German Army, but cannot recall my German Army serial number. As soon as I was sworn in and given my German Army uniform I was immediately sent, with a group of approximately twenty-two others, to Paris, France, for training. I was not even permitted to return to my residence before departure and the purpose of sending this particular group to Paris was to train us for the rank of Sonderfuehrer, interpreter in the German Army."

After his arrival in Paris he was given certain military training and commissioned as a Sonderfuehrer which ranked him with lieutenants of infantry. He was also attached to a certain special Intelligence unit trained to take part in invasion of England, then anticipated for the particular purpose of capturing British Intelligence documents and British Intelligence personnel. The invasion of England having been called off, plaintiff volunteered to his commanding officer to be sent to the United States as an undercover espionage agent, and as a result he was returned to Berlin where the proper authorities decided that his American experiences especially fitted him and his pat-

ent law work furnished complete cover for an assignment in the United States as a "spy." He was given a special course of training in preparation for his espionage assignment in the United States. Without relating the particulars of this training, it is sufficient to note that it had to do with a method of secret writing by which certain code messages might be transmitted. It was left up to plaintiff to compose his own cover story to conceal his activities and identity as a spy. He conceived a story to the effect that he had been employed continuously by Siemens-Halske from the time he arrived in Germany in November 1938 to that of his departure in June 1941, and that he was going to and into the United States as their patent representative under a contract paying him $450 per month. Arrangements were made by the German military authorities with Siemens-Halske for the preparation and delivery to plaintiff of a false contract to this effect, and it was signed and dated April 28, 1941. It was arranged that his pay as a Sonderfuehrer in the German Army be paid into plaintiff's bank account in Berlin, which was done until the fall of 1944. He brought with him to the United States some genuine patent applications which he subsequently filed in the patent office at Washington. He also brought some fictitious applications relating to certain equipment which he brought to this country as a part of his plan to obtain the admission of such equipment.

Plaintiff admitted to the F.B.I. that after he reached the United States he was to "obtain information about military aircraft and the sailing of ships to the allied countries." Before leaving Berlin he was given $2,000 in used United States currency by Army officials and with their consent he exchanged about $1,000 of other funds into American dollars. On May 7, 1941, plaintiff applied to the American consul in Berlin for validation of the American passport previously held by him which he had permitted to expire in January 1940. In making this application, plaintiff falsely stated that he had been continuously employed by Siemens-Halske since his arrival in Germany in 1938 and failed to mention his German Army connections. On the basis of this application, a new passport was issued to him by the American consul on May 8, 1941. In coming to the United States from Berlin, he traveled by way of Paris and Madrid. At the latter point, he was paid his expenses by the German Embassy. Plaintiff arrived in New York on August 24, 1941.

Inasmuch as plaintiff contends that he volunteered to his superiors as a spy merely as a ruse to obtain an opportunity to return to and "do my duty" for the United States, it appears material briefly to relate his activities subsequent to his arrival here. On November 27, 1941, several months after his arrival, he wrote a letter to certain German Army officials as follows: "I have not as yet received the model which I am to exhibit to the Examiners of the Patent Office and which was supposed to be shipped to me shortly after I left Madrid." Plaintiff at the hearing admitted that the meaning and purpose of this letter was to call to the attention of the German Army officials the fact that he had not as yet received the high powered microscope which was promised to be sent him for use in performing the secret work which he had been assigned to do in the United States.

On January 23, 1942, plaintiff applied for a position as a special agent with the F.B.I. He also filed a civil service application for a position as a lawyer with the United States government and an application to be appointed to the Department of Justice. In February 1942, he applied for a commission in the Navy in connection with Intelligence work. In some or all of these applications he falsely represented under oath that he had been continuouslyemployed by Siemens-Halske from 1938 until May 31, 1941, and in none of them did he divulge the information that he had served in the German Army. He testified at the trial, "I naturally never told anybody anything about my army experience in Germany, or my scheme of coming back to this country." He previously had stated to the F.B.I.:

"I have at no time, until being interrogated in connection with the preparation of this statement, acquainted any representative of the United States Government with the fact that, at the time of my return to the United States in August, 1941, I entered the country as a Sonderfuehrer in the German Army and an agent of the German espionage organization."

Plaintiff was inducted into the United States Army on May 2, 1942. After his induction, he was sent to Fort Knox, Kentucky, where at his request he was assigned to the G-2, the Intelligence Department of the armored force. Subsequently he was transferred to Fort Benjamin Harrison, Indiana, under the provisions of a general War Department order which related to soldiers who had relatives in enemy or enemy-occupied countries. On September 4, 1945, plaintiff was taken into custody by the United States Army and interrogated by the F.B.I. and other Army officials, as heretofore related. During the first day of this examination he steadfastly denied all the incriminating accusations relative to his activities in Germany. However, on the second day he repudiated his denial and for the first time since returning to the United States told what he asserted was the complete story. He assigned as reasons for not telling the truth concerning his activities in Germany that he "was afraid" the Germans would learn of it and "take reprisals on my family," and because he thought that United States authorities would not believe he was telling the whole truth since the "information which I had in my possession was in my opinion so insignificant."

That which we have related is the testimony coming from the plaintiff's own lips, which we think standing alone affords complete justification for the order dismissing his suit. While he denied on the witness stand that he had taken a formal oath, he admitted that if requested he would have done so as he "would have had no other choice." He also admitted signing some papers which might have contained an oath. He admits in his brief filed in this court that "he has never denied that there might have been some kind of oath or action to substitute for such oath, for example, in the form of his signature under some military document." He stated to the F.B.I., as shown by defendant's exhibit 15, that he "was sworn into the German Army, I believe, at the barracks of the Grenadier Kaserne in the Kaiser Wilhelmstrasse or Kaiser Wilhelmdamm in Berlin-Wilmersdorf." At the trial he admitted unequivocally that he had been "repatriated" as a German citizen and that he had "received some document to that effect." He also admitted that this was a necessary requirement prior to his entry into the German Army. He stated his purpose in so doing as follows:

"The German Government required my induction into the Army, but as a soldier of the German Army, I had to have German citizenship, so I had to become—had to be repatriated to get into the army."

Sec. 401 of the Nationality Act of 1940, c. 876, 54 Stat. 1137, 1168, 1169, 8 U.S.C.A. § 801, provides:

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

"(a) Obtaining naturalization in a foreign state, either upon his own application or through the naturalization of a parent having legal custody of such person * * *; or

"(b) Taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state; or

"(c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state."

Sec. 2 of the Act of March 2, 1907, c. 2534, 34 Stat. 1228, provides:

"That any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state."

We think it requires no citation of authority or discussion to show that plaintiff lost his nationality under each and all of the foregoing provisions. Also, there is Sec. 1 of the Act of July 27, 1868, c. 249, 15 Stat. 223, 224, Rev.Stat. § 1999, 8 U.S.C.A. § 800, which defines the right of expatriation. As to this provision, the court in Perkins v. Elg, 307 U.S. 325, 334, 59 S. Ct. 884, 889, 83 L.Ed. 1320, stated:

"By the Act of July 27, 1868, Congress declared that 'the right of expatriation is a natural and inherent right of all people'. Expatriation is the voluntary renunciation or abandonment of nationality and allegiance."

While we do not think it necessary to indulge in any presumption against plain-

tiff in face of his own positive and direct testimony, the fact remains that by virtue of Sec. 2 of the Act of March 2, 1907, c. 2534, 34 Stat. 1228, there is a presumption against him. This section provides:

"When any naturalized citizen shall have resided for two years in the foreign state from which he came, * * * it shall be presumed that he has ceased to be an American citizen * * *."

█ Certainly there is no room for doubt that plaintiff renunciated and abandoned his United States nationality, and that he resumed the nationality of his native country and renewed his allegiance thereto. Plaintiff is driven to the position where he must rely entirely upon his assertion that all of his acts and conduct which unmistakably disclose his allegiance to his native country and the renunciation of allegiance to his adopted country were involuntary and that he is not responsible therefor. His own statements demolish this contention. When he left the United States in 1938, he signed an application converting his United States money into German money, stating that he "intended to return to Germany for good." He permitted his American passport to expire in January 1940. It was not until 1941 when he planned to return to the United States as a German spy that he made application for a new passport and this was obtained upon representations which are admittedly false. His course of conduct subsequent to his arrival in this country in August 1941 and until his unmasking in the latter part of 1945, including his failure to reveal his connections with the German Army and his other activities while in that country and his many false statements in connection therewith, clearly dispel any grounds for the contention that he was loyal to the United States. His belated revelation of what he now relies upon to exculpate him for his conduct is clearly a sham and a pretext designed to meet an exigency born of the situation of his own creation. As Judge Lindley aptly stated:

"He says he was afraid, but there is such a thing as a loyal American citizen being afraid to do his duty and yet doing it, and his statement carries to me no conviction whatsoever. He did not report what a faithful American citizen would have reported."

It is hardly necessary to consider the testimony which was offered by the defendant and we shall do so only briefly. Dr. Heinrich Kronstein, an expert in German law, testified that all soldiers in the German Army were required to take an oath upon entering the service which was a "solemn obligation of the German man upon entering the military service to give his body and life for the Fuehrer, for Reich and people, in conformity with the 'duties of the German soldier'". Col. Kurt Walter, who had been a member of the regular German Army from 1908 to 1920 and 1936 to 1945, and who had specialized in problems concerning mobilization and induction into the Army, testified to the same effect and that if for any reason an individual could not appear at the swearing in ceremony, his commander was required personally to administer the oath to him for "every commander is personally responsible that every individual man has sworn the oath of allegiance," and he expressed the opinion that in 1940 it was impossible that a mistake could have been made concerning the requirement that every soldier should take an oath upon his induction into the German Army. Paul Wiegand, the head of the patent department of Siemens-Halske, for whom plaintiff worked, testified that he "asked for German citizenship."

█ Ruth Edith Bauer, divorced from plaintiff after his return to the United States in 1941 but who was living with him while in Germany, testified that to her knowledge plaintiff made no effort to return to the United States in 1940 and that so far as she knew he had no desire to do so. Plaintiff told her in the spring of 1940 that "he had made up his mind that he should do his duty for his fatherland, too, and might join the German Army." At about this time, his brother Wolfram, an officer of the regular German Army, was seriously wounded and plaintiff "felt pretty bad about it and he decided at that time to join the German Army." In 1941, when the witness expressed concern in regard to her husband's trip to the United States as a German Army officer, he told her that some

men do their jobs in the Army simply as soldiers but this trip to the United States "is his job in the Army." Much criticism is directed at the testimony of this witness on the basis that she was plaintiff's divorced wife and therefore hostile. The credit and weight, however, to be attached to her testimony as well as that of all other witnesses, was peculiarly a matter for the trial court. More than that, her testimony is so consistent and corroborative of that given by the plaintiff himself that we see no reason to disbelieve it. It has the ring of sincerity and truth.

█ We need not discuss the contention that the court admitted improper evidence. Certainly there is nothing in this contention which could constitute prejudicial error. Some of the testimony complained of was admitted without objection and much of it was brought out on the plaintiff's cross examination. In any event, in our opinion as already stated, the testimony and statements of plaintiff himself would have precluded any other result than that reached by the court.

█ There is no merit to the contention that because plaintiff served in the German Army prior to January 13, 1941, the effective date of the Nationality Act of 1940, the judgment is based upon an ex post facto law. While it is true that plaintiff joined the German Army prior to the effective date of this Act, it is also true that he was serving and continued to serve in that Army and as a spy in this country long after the Act became effective. Furthermore and more important is the fact that under the law as it existed prior to the Nationality Act of 1940, plaintiff lost his United States nationality by reason of his acts and conduct. See Sec. 2 of the[*] Act of March 2, 1907 and Sec. 1 of the Act of July 27, 1868, 8 U.S.C.A. § 800, heretofore referred to.

█ Plaintiff also makes an argument that he is now a national of France inasmuch as Alsace-Lorraine where he was born is now a part of France and not of Germany. This argument is beside any issue involved in this case. The only issue tendered by plaintiff's complaint was whether he was a citizen or national of the United States. The court below in dis-

missing his complaint decided that he was not. It is therefore immaterial insofar as this appeal is concerned whether he is a national and citizen of Germany or France.

The decree dismissing the complaint is affirmed.