REX PAPER COMPANY, a corporation, Plaintiff,

v.

REICHHOLD CHEMICALS, INC., a corporation, Defendant.

Civ. A. No. 4318.

United States District Court
W. D. Michigan, S. D.

March 29, 1966.

---

Stratton, Wise, Huston, Early & Starbuck, Kalamazoo, Mich., Benjamin W. Wise and Charles E. Starbuck, Kalamazoo, Mich., of counsel, for plaintiff.

Uhl, Bryant, Wheeler & Upham, Grand Rapids, Mich., Goetz, Goetz & Foley, Detroit, Mich., Gordon B. Wheeler, Grand Rapids, Mich., John Goetz, Detroit, Mich., of counsel, for defendant.

FOX, District Judge.

This is an action by plaintiff, a manufacturer of high-grade paper for use in the printing industry, against defendant, a manufacturer of a urea-formaldehyde resin known as Beckamine, or P-685 Beckamine, a raw material used by paper manufacturers in order to make the starch coating of paper insoluble. The action is based on negligence and breach of warranty, both expressed and implied.

Plaintiff is a Michigan corporation with its principal place of business in Michigan. Defendant is a Delaware corporation with its principal place of business in New York. Jurisdiction is conferred by 28 U.S.C. § 1332(a) and (c).

Plaintiff began to use Beckamine in its manufacturing operations late in 1956, or early in 1957, after defendant's salesman, Ralph Carter, represented to plaintiff that the product was suitable for the use intended by plaintiff. At the time he also stated that the product had a six-month "shelf life."

In late August of 1961, defendant shipped forty drums of Beckamine to plaintiff. Twenty-eight of the drums were from defendant's batch # 3035, manufactured July 13, 1961, and twelve of the drums were from batch # 2424, manufactured June 8, 1961.

In November of that year, a number of complaints were received from plaintiff's customers regarding the quality of paper. Small specks appeared on the surface of the paper, visible only on close inspection, which peeled away from the paper in printing processes, leaving gaps of print or uncolored areas on the finished paper.

Plaintiff checked its records and discovered that the defective paper was manufactured in the early part of October, 1961. Further inspection revealed that these imperfections existed in many of the rolls of paper on hand at the Rex plant.

At this point in the opinion, it would be well to briefly set forth some basic facts about the manufacture of paper. It is made in solution, where it sinks to the bottom and settles on a screen. It is

then passed through rollers to remove moisture, and then through dryers. In order for paper to be suitable for certain types of printing, it must be given a coating. This is done by passing the paper through a "size" solution, which imparts the necessary characteristics to the paper. This solution contains, among other ingredients, defendant's product, Beckamine; at least this was the case in plaintiff's solution in 1961.

A systematic examination of the production machinery began in November, in an attempt to locate the source of the trouble. On the first of that month small hard lumps were removed from the dryer, by replacing the roll containing them. On the tenth the size tank, which contained the solution for coating the paper, was cleaned.

On November 14, they found flakes in the sheets of paper, and, after making some additional cleanings and changes without effect, they substituted another urea-formaldehyde resin for Beckamine on the seventeenth. On the twenty-first, they still found flakes in the paper, and on the next day cleaned the system of all "broke," that is, waste paper which is reused in the manufacturing process. Thereafter no difficulty was encountered.

Mr. Klein, the technical director at Rex Paper Company, and Mr. Slevatz, a chemist working under him at the time, conducted tests in an attempt to isolate the offending element in the paper. Their results left them with no definite conclusions, although they had some reason to suspect the Beckamine, and a Dr. Robert Diehm, of the Paper Technology Department at Western Michigan University, was called in to investigate the situation.

Dr. Diehm was provided with samples of the specks, or fiber bundles, as he called them, and also with ten samples of Beckamine from the shipment of August 1961. In his opinion, the urea-formaldehyde resin was the cause of the trouble experienced at the Rex plant in the Fall of 1961.

In December of 1961, after Rex had again begun production of satisfactory paper, they returned to the use of Beckamine and found no difficulty in their manufacturing operations. This is pointed to as evidence that the Beckamine received in the August shipment was faulty.

For the factual reasons which will be discussed shortly, the court finds that the plaintiff has not met the burden of proof required to sustain its case.

■ In order to recover in a products liability case, two elements must be established: that the product or article in question left the manufacturer's possession in a defective state, and that as a result of this defect, the plaintiff has been damaged. Piercefield v. Remington Arms Co., 375 Mich. 85, 133 N.W.2d 129 (1965). See also Barefield v. LaSalle Coca-Cola Bottling Co., 370 Mich. 1, 120 N.W.2d 786 (1963).

■■ However, this does not place an impossible burden on the plaintiff—he need merely show that the goods did not have the properties warranted. Hansen v. Firestone Tire & Rubber Co., 276 F.2d 254 (CCA 6, 1960). Unexplained, the defects speak for themselves as evidence of breach of warranty. Manzoni v. Detroit Coca-Cola Bottling Co., 363 Mich. 235, 109 N.W.2d 918 (1961).

At the outset of this discussion, it must be said that the claimed breach of warranty relating to the defendant's representation that Beckamine had a six-month shelf life has absolutely no force without a showing that the product was in fact defective, since the dates here involved fall well within the six-month period from the date of manufacture of the Beckamine in question. The court mentions this because there was some time spent at the trial of this case in an effort to establish that the drums of Beckamine were not dated, but rather marked with a numbered code which was not explained to the plaintiff. Plaintiff was in no way harmed by this marking system, and, even assuming the contested fact that it was never advised of the workings of this system, there can be no recovery on this basis.

In analyzing the record of this case, it appears that the strongest case which plaintiff can maintain is grounded on two points: the testimony of Dr. Diehm, plaintiff's expert, and the fact that in December, after the paper-manufacturing system had been completely cleaned of all elements which could possibly have contained Beckamine and new Beckamine was again used in the formula at the size press, good paper was obtained.

First, as to Dr. Diehm's testimony, attention focuses on the tests which formed the basis of his conclusion that Beckamine was the source of the trouble. His tests were what are known in the field of chemistry as "qualitative" tests, that is, they indicate the presence or absence of certain chemical elements, but not the quantity, or concentration of those elements. A positive test for aldehydes, an element of urea-formaldehyde resin, was obtained.

In addition, Dr. Diehm, made some computations to indicate the percentage of urea resin in the specks which he was testing.

In opposition to this testimony, defendant attempted to show that the positive aldehyde test was not a reliable test to prove the source of the aldehyde, and offered proof to show that the "broke" containing a casein coating would result in a similar positive test. Dr. Diehm admitted that this was possible, although he did not consider it probable, on the basis of his tests.

Dr. Diehm also testified that the specks on the paper would contain a greater percentage of urea resin than the size solution used to treat the paper in the manufacturing process, since in solution the concentration would be less than in a speck on the surface of the paper. However, computations by Mr. Hewett, director of research at Reichhold, showed that the figures arrived at by Dr. Diehm were actually *less* than the percentage of urea resin in the solution itself, thus strongly controverting the inference that the specks were concentrated urea resin.

Defendant introduced proof that Beckamine is usable in a size press solution if it will pour from a spigot. Viscosity tests are run at the Reichhold plant and both of the batches at issue here were within the normal range of viscosity before being barrelled. Dr. Diehm testified that the samples he was given were generally within the range used by the paper industry. Representatives of Reichhold visited the Rex plant after receiving the complaints and the barrels which they tested were also found to be satisfactory.

It is notable also that Mr. Warren, who joined Rex in 1958 as mill superintendent, checked Beckamine during the period in question and testified that it did not seem like bad Beckamine, which he had seen on other occasions, but which was different from what he then saw.

It was also argued at trial, however, that the viscosities did exceed those published in the specifications accompanying Beckamine. Defendant alleged that these specifications referred to the time of manufacture, since the product, as do all urea-formaldehyde resins, tends toward a solid state from the time it is first formed. This fact was confirmed by Dr. Diehm. The issue is moot in view of the established fact that the tested samples, some of which were nearing the end of their shelf life were nonetheless within usable limits of the paper industry.

Plaintiff stated in its complaint that eight barrels of Beckamine were defective, and in its trial brief stated that during the period in which difficulty was encountered samples were taken from different drums of Beckamine with the same results—bad paper. However, at trial, it was disclosed that one drum had been disposed of after a call to Reichhold informing the Reichhold people that they were having difficulty which they attributed to Beckamine. There is a dispute over whether or not this disposal was ordered by Reichhold, but in any event, the missing drum was never tested.

In view of the strong testimony establishing that the product Beckamine was usable if pourable from a spigot, and Dr. Diehm's findings that the samples he tested were within the acceptable limits

of the industry, plus the samples poured by the Reichhold representatives on their visit to the plant, if plaintiff did in fact use more than one barrel of Beckamine in an attempt to solve its problem, the evidence indicates that the defect originated elsewhere, since all the existing barrels tested contained usable Beckamine. If they used only the one barrel which was never tested, the remaining "good" barrels, together with other evidence in the case, tend again to indicate another source of the difficulty.

It is undisputed that the batches met acceptable standards before they were barrelled at the Reichhold plant. Evidence of such practices as quality control and other tests such as this are properly received in evidence to negate the probability that the defect claimed was in the product at defendant's plant. Barefield v. LaSalle Coca-Cola Bottling Co., supra.

A further point to consider in weighing Dr. Diehm's opinion is the fact that he conducted no tests on anything save the samples given him by Rex. Mr. Kline had testified earlier that in his examination of the defective paper, some of the specks had given a positive test for urea-formaldehyde, some had not. Yet all of the specks given Dr. Diehm to test did give the positive test.

In addition, the size press solution formula contained, in addition to Beckamine, clay, starch, and acid. There are no records kept by Rex of the shipment, order number or batch with relation to these ingredients, and it is thus impossible to determine whether or not there was anything defective in their composition or whether or not foreign materials were in any of them when they were used during the period of defective production.

For this reason the fact that good paper was produced in December of 1961 is also of less probative value than it would have been had it been conclusively shown that the other ingredients of the formula were beyond suspicion. But in view of the limited character of the tests conducted by Dr. Diehm, this cannot be assumed, nor can his opinion, standing alone, provide the preponderance of evidence required to result in a judgment for plaintiff, considering all the facts and circumstances of this case.

■ The court is not bound by expert testimony, but must consider it in connection with all of the facts and circumstances of the case. Shapiro v. Wendell Packing Co., 366 Mich. 289, 115 N.W.2d 87 (1962); Vial v. Vial, 369 Mich. 534, 120 N.W.2d 249 (1963).

A final point to consider in the factual presentation of this case is the problem encountered by plaintiff. There was considerable testimony as to the various difficulties inherent in the paper-making industry. Defendant attempting to establish that this sort of complaint is so common as to be almost an accepted risk in the industry, the cause of which is unknown. Plaintiff admitted that there were often common imperfections in paper produced, but denied ever having itself experienced this type. Thus, as in many other aspects of proof in this case, there was conflicting testimony. Considering this testimony, as well as the other facts and circumstances in the case, the statement of one of plaintiff's own witnesses that the manufacture of paper is not an exact science, but even in this day and age somewhat of an art, lends further conviction to the court's finding that plaintiff has not met its burden of proof in this case.

■ It is axiomatic that the burden of proof in its primary sense rests upon the party who asserts the affirmative of an issue, and that burden remains there until termination of the action. Bauer v. Clark, 161 F.2d 397 (CCA 7, 1947), cert. den. 332 U.S. 839, 68 S.Ct. 210, 92 L.Ed. 411 (1947), reh. den. 332 U.S. 849, 68 S. Ct. 342, 92 L.Ed. 419 (1948). Plaintiff here has failed to sustain that burden.

■■ Plaintiff here has shown damage, but has not satisfactorily demonstrated that the damage was a result of a defect in the product alleged to have been the cause of the damage. By reason of the lack of records and the absence of any positive showing that the Beckamine was defective, plaintiff was forced to rely

upon circumstantial evidence, which can, it is true, prove a case or a fact in issue fully as competently as direct evidence. Zolton v. Rotter, 321 Mich. 1, 32 N.W.2d 30 (1948); Heppenstall Steel Co. v. Wabash Ry. Co., 242 Mich. 464, 219 N.W. 717 (1928). Nonetheless, as stated in the case of Kaminski v. Grand Trunk Western Railroad Co., 347 Mich. 417, 79 N.W.2d 899 (1956), quoting City of Bessemer v. Clowdus, 261 Ala. 388, 74 So.2d 259, with approval:

> "'As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them they remain conjectures only. * * *'" Id. at 79 N.W.2d 901–902.

The Court of Appeals for the Sixth Circuit has stated the proposition in this way:

> "The cases are legion which hold that to submit to a jury an issue which involves but a choice of probabilities, is to submit to the jury a decision based not upon substantial evidence, but upon conjecture, surmise and guess." Commercial Standard Ins. Co. v. Gordon's Transports, 154 F.2d 390, 394 (1946).

The plaintiff cites the Kaminski case, supra, in support of the position that if the plaintiff has proven sufficient facts to justify a verdict on one theory, the fact that there are other seemingly rational explanations of the incident does not preclude recovery.[1] All that plaintiff has proven in this case is that it was damaged as a result of having manufactured defective paper in the Fall of 1961. The other facts necessary to justify a verdict for plaintiff have not been sufficiently proven. Like the court in Poledna v.

Bendix Aviation Corp., 360 Mich. 129, 103 N.W.2d 789 (1960), commenting upon the Kaminski case, this court finds no evidence with "selective application" to plaintiff's theory as to the source of its trouble. And evidence which tends to support two conflicting hypotheses tends to prove neither. Nash v. Raun, 149 F.2d 885 (CCA 3, 1945), cert. den. 326 U.S. 758, 66 S.Ct. 99, 90 L.Ed. 455 (1945).

In light of the facts and circumstances in this case, the court is unable to say that plaintiff has met its burden of proof.

As to the negligence count of the complaint, plaintiff conceded at oral argument that it was unable to show any negligence in the manufacture of the product, but asserted that there must have been negligent storage in the open sun. As to this allegation, there is a complete failure of proof, and no cause of action has been established.

For the reasons stated, judgment will be entered for the defendant.

---

1. Plaintiff relies for this position upon the remainder of the above quote from the Kaminski case, viz.:

 "On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence." 79 N.W.2d 899, 902.