FARGO MACHINE & TOOL COMPANY,
a Michigan Corporation, Plaintiff,

v.

KEARNEY & TRECKER CORPORA-
TION, a Wisconsin Corporation,
Defendant,

v.

ALLEN–BRADLEY COMPANY, a Wis-
consin Corporation, Third-Party
Defendant.

KEARNEY & TRECKER CORPORA-
TION, a Wisconsin Corporation,
Plaintiff,

v.

FARGO MACHINE & TOOL COMPANY,
a Michigan Corporation, Defendant,

v.

ALLEN–BRADLEY COMPANY, a Wis-
consin Corporation, Third-Party
Defendant.

Civ. Nos. 39836 and 4–70185.

United States District Court,
E. D. Michigan, S. D.

Feb. 7, 1977.

George H. Goldstone, Clyde B. Pritchard, Southfield, Mich., for plaintiff.

H. G. Sparrow, III, Detroit, Mich., Malcolm D. Young, Omaha, Neb., Robert V. Seymour, Detroit, Mich., for defendant.

## OPINION

GUY, District Judge.

These consolidated contract cases arise from a dispute over payment of the remaining balance due on a sophisticated piece of automated industrial equipment used for machining metal. Fargo Machine & Tool Company, the purchaser, is a machine shop in Michigan and Kearney & Trecker Corporation, the seller, is a Wisconsin corporation which manufactures industrial machines. Allen-Bradley, also a Wisconsin corporation, and third-party defendant in this suit, manufactured and supplied to Kearney & Trecker a major portion of the electronic system which controls the machine in question.

The president of Fargo, Mr. Fortunski, contacted a local Gorton (a Kearney & Trecker subsidiary which has since been absorbed) sales representative early in 1970 after noticing a two-page advertisement in a prominent trade journal for the "Series H–60 Milwaukee Matic Machining Center." In May of 1970, after reviewing Gorton's promotional literature and specifications with the salesmen, Fortunski and his chief engineer, McCaffrey, went to Gorton's Wisconsin headquarters for a demonstration. They were quoted an added cost figure to equip the machine with a larger table (designating the machine H–100) and on June 1, 1970, accordingly submitted a purchase order in a total amount of $153,725.00 detailing specifications and the desired options. Fargo attached to its order a copy of "terms and conditions governing quotations" which had earlier been provided by Gorton, and on July 1, 1970, Gorton acknowledged and accepted.

Delivery was made in August of 1971, and installation was completed late in September of 1971. The machine was not operating to the full satisfaction of Fargo and a lengthy series of service calls commenced. Gorton's service calls were made, in 1971, from September 30 through October 1; October 26, in 1972, March 1, March 13 through 16, June 5, June 29 through June 30, July 13 through July 14, July 17 through July 21, August 23 through August 25, September 28 through September 29, October 2 through October 6, October 11, October 30 through November 1, and November 8 through November 9; in 1973, January 22, January 24 through January 26, January 29 through February 3, February 12, March 8 and March 21.

Fargo had paid $75,000.00 on the machine on September 1, 1971, leaving approximately the same amount due. As of January, 1972, the balance had not been paid and a Kearney & Trecker vice-president, Christopherson, called on Fargo to try and arrange payment. The substance of the complaints aired by Fargo in that meeting is reflected in the confirming correspondence Fortunski

and Christopherson exchanged in February of 1972. Fortunski, although dissatisfied with still unresolved technical problems, agreed to pay $28,868.00, reducing the balance due to $50,000.00 in return for Kearney & Trecker's promise to make good on the machine notwithstanding the warranty expiration and to correct specified deficiencies. See also Kearney & Trecker affidavit from Wisconsin pleadings, Exhibit No. 55 re warranty extension of six months.

Kearney & Trecker advised Fargo by letter dated June 16, 1972, that the particular problems they had discussed had been remedied and that prompt payment of the balance due was in order. Although Fargo did not respond to this letter, Fortunski and McCaffrey testified that all the problems had not been eliminated and, further, that new problems were still developing. By letter of September 7, 1972, Fortunski expressed further misgivings about paying the balance due since Kearney & Trecker had not been able to remedy the machine's problems even while that incentive was outstanding. Another meeting was held in October of 1972 at which Fargo submitted a further list McCaffrey had prepared noting uncured defects Fargo considered incompatible with satisfactory operation of the H-100.

Service calls continued until March 21, 1973, the parties having again met on March 1st. On April 6, about two weeks after its last call, Kearney & Trecker filed suit in state court in Wisconsin to recover the balance due. Fargo counter-claimed in breach of warranty and removed to the United States District Court for the Eastern District of Wisconsin. Thereafter, Fargo filed its own action against Kearney & Trecker in the United States District Court for the Eastern District of Michigan alleging breach of warranty and attempted "recission." Venue in the Wisconsin action was transferred to Michigan and both cases were consolidated before this court. Kearney & Trecker thereafter impleaded Allen-Bradley as third-party defendant on an indemnity theory.

Before proceeding to the principal claims of the parties, it is expedient to consider the third-party claim against Allen-Bradley. The court is disposed to dismiss Kearney & Trecker's third-party claim in indemnity against Allen-Bradley on the grounds that no case for recovery against Allen-Bradley was presented separately or as part of a case in chief, defendant Kearney & Trecker having rested at the close of Fargo's case.

The status of Allen-Bradley here may be described as that of a component supplier. The Allen-Bradley component is comprised of a rack into which approximately fifty integrated circuit boards or modules of complex miniaturized circuitry are inserted which control, in part, the functions the machine performs. Were indemnity to lie against Allen-Bradley, it must initially be predicated on a showing that the component part that Allen-Bradley supplied, the Allen-Bradley control unit, had a causative link with the machine's malfunctions. *Indemnity Insurance Co. v. Otis Elevator,* 315 Mich. 393, 24 N.W.2d 104 (1946). Proving this hypothesis, however, posed a very basic difficulty. Fargo had no claim directly against Allen-Bradley and no problems that it traced *directly* to a defect in the Allen-Bradley portion of the H-100. Fargo's allegation, in essence, was that the machine did not work automatically and that the cause could not be pinpointed or would have been fixed. Fargo, thus, was of no assistance in attributing problems to specific defects in the Allen-Bradley control. Kearney & Trecker, on the other hand, concentrated on attempting to show that the faults were either de minimis, had been substantially remedied, resulted from Fargo's fault, or were not communicated to Kearney & Trecker. The end result, of course, was that, at the close of plaintiff's case, the evidence provided no indication that any existent malfunctions were specifically attributable to defects in the Allen-Bradley control. Indeed, to the contrary, the testimony of Mr. Martin, an Allen-Bradley field service manager, was that those portions of the Allen-Bradley control which showed visible irregularity or modification had been altered after it had undergone

extensive Allen-Bradley testing and after the unit had left Allen-Bradley hands and been shipped to Gorton. It is beyond argument that a component supplier cannot be liable in indemnity where the part has been altered or modified after it has left his control. *Grummons v. Zollinger,* 189 F.Supp. 64 (N.D.Ind.1960); *Frank R. Jellef, Inc. to use of Liberty Mutual Insurance Co. v. Pollak Bros., Inc.,* 171 F.Supp. 467 (N.D. Ind.1957). Further indications of modification are evident in the service reports of Allen-Bradley personnel who attended Gorton to trouble shoot problems that developed when the Allen-Bradley control was "married" to the Gorton portion. One report shows that Gorton's addition of a single wire to a bundle running from the module rack to the interface panel was responsible for generating electrical "noise" which caused the machine to shut itself off during a particular function. Furthermore, the H–100's "controls" do not consist entirely of the Allen-Bradley unit, but, according to McCaffrey's testimony, rather are comprised additionally of Gorton components such as the magnetics cabinet. In light of the complexity and sophistication and interrelation of this machine's controls (including the Allen-Bradley portion), this court cannot speculate as to a crucial and technical facts such as isolating ultimate responsibility for malfunctions. Since Kearney & Trecker technical personnel participated in the servicing of this machine, Kearney & Trecker was clearly in the best position to offer testimony, if such was available, connecting the *unaltered* Allen-Bradley unit with specific problems. None was so offered. Accordingly, and for lack of any showing that defects in the Allen-Bradley unit, as supplied to Kearney & Trecker, were at the root of any malfunctions, Kearney & Trecker's third-party indemnity claim against Allen-Bradley is dismissed.

In proceeding to the principal claims of the parties, a preliminary procedural point should be recognized. Since the consolidated cases at bar were instituted, one by Kearney & Trecker and one by Fargo, each party is present in a dual capacity as both plaintiff and defendant. However, since the pleadings of the later action, filed by Fargo as plaintiff, encompass all the issues raised in the prior proceeding, the court will deal with the issues in the context of the parties' designations in the later case, i. e., Fargo as plaintiff and Kearney & Trecker as defendant.

■ Fargo's complaint alleges that the H–100 is "defective in material and workmanship" and "has required numerous and repetitive repairs, including some thirty-seven separate repair jobs." Certainly, however, every mechanical failure in a new and complex machine does not constitute a breach of warranty. *N.C.R. v. Adell,* 57 Mich.App. 413, 225 N.W.2d 785 (1975). At the outset then, it is necessary to distinguish and segregate those defects which merely required that work be performed and those legally significant defects which either remained uncured after reasonable opportunity to correct them or which are otherwise related to plaintiff's damage claims. Fargo does not contend that it was entitled to a perfect machine, nor that the installation and break-in period should have been completely service free. Exactly what Fargo was entitled to is governed by the Uniform Commercial Code unless permissibly modified by agreement between the parties.

■ Sections 2313 through 2316 (M.S.A. §§ 19.2313–19.2316, M.C.L.A. §§ 440.2313–440.2316) set out the circumstances under which express and implied warranties arise and the procedure which must be followed in order to exclude or modify such warranties. Section 2313(1) on express warranties indicates that they are created by (1) affirmations of fact or promise; (2) descriptions of the goods made part of the basis of the bargain, and (3) samples or models made part of the basis of the bargain. It is clear that advertisements and promotional literature can be a part of the basis of the bargain where they are prepared and furnished by a seller to induce purchase of its product and the buyer relies on the representations. *Capital Equipment Enterprises*

*v. North Pier Terminal,* 117 Ill.App.2d 264, 254 N.E.2d 542 (1969); *Cooper Paintings & Coatings v. S.C.M. Corp.,* 62 Tenn.App. 13, 457 S.W.2d 864 (1970). At bar, Fortunski's testimony indicated that the sales material provided him was carefully reviewed both with McCaffrey and the Gorton sales representative. Certain representations in the Gorton catalog were of particular importance to Fargo, e. g., the machine's "absolute repetitive accuracy", small-lot production automation by sequential production of up to thirty tools for separate steps without an operator intervening, and Gorton's assumption of single point responsibility for the machine and replacement parts notwithstanding that various components were supplied by other manufacturers. Additionally, the purchase order incorporates by reference an eight-page document of technical specifications, Gorton's form P–3472.

In addition to any such express warranties running to the buyer, the law implies a warranty of merchantability in a commercial contract of sale unless excluded by the parties. Section 2–314 of the Uniform Commercial Code, as pertinent to the issues in this case, provides that to be merchantable, goods must at least be such as pass without objection in the trade under the contract description and must be fit for the ordinary purposes for which such goods are used.

Given the existence of facts from which express and implied warranties could flow in the transaction at bar, the issue of modification or exclusion of warranties by the parties must be considered.

Section 8 of the "terms and conditions" attached to Fargo's purchase order is titled "Warranty of Material and Workmanship." The first two paragraphs create an express warranty that the product is free of defects in material and workmanship for the shorter of twelve months from delivery or four thousand operating hours and provides for prompt notice and a set procedure when a defect is claimed. The third paragraph limits seller's obligation with respect to components so as not to exceed the warranty extended to seller by his supplier. The last paragraph is a comprehensive exclusionary provision in standard print without indented margins, contrast print, or other conspicuous aspect which reads, in part: "This warranty is in lieu of any other warranty whether expressed or implied other than a warranty of title. There are no warranties of merchantability or fitness."

The effect of Section 8 is governed by U.C.C. Section 2–316, providing a separate rule for modification of each type of warranty. Subsection (1) sets down no specific procedure for excluding express warranties but provides that words or conduct relevant to the creation of an express warranty shall be construed, where reasonable, to be consistent with words tending to limit or negate such warranty; if such construction is unreasonable, the limitation or negation is inoperative to that extent.

Applying subsection (1) to the facts at bar, it is apparent that the express representations made in the sales literature and the provisions of Section 8, "Terms and Conditions," may be construed consistently. The language in Section 8, warranting the product free from defect in material and workmanship, is entirely consistent with the promotional literature's description of what the machine could do. The tandem effect of these writings may be construed to be that the sales material and technical specifications on the order established the standard of the product's performance when free of defects in material and workmanship. Thus, the exclusionary language does not render inoperative the seller's express representations in the promotional literature it supplied.

In regard to excluding implied warranties, Subsection (2) of U.C.C. 2–316 provides in part:

" . . . to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous."

From the face of the exclusionary clause, it is apparent that "merchantability" is expressly mentioned and that the exclusion for fitness is "by a writing." The conspicuousness requirement, however, exposes a potential defect in the last paragraph of Section 8 which purports, in standard small print, to exclude any warranties of merchantability and fitness. "Conspicuousness" is a term of art under the code, and is defined in Section 1–201(10):

"'Conspicuous': A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON–NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color. But in a telegram any stated term is 'conspicuous'. Whether a term or clause is 'conspicuous' or not is for decision by the court."

The official comment to this definition states:

"'Conspicuous'. New. This is intended to indicate some of the methods of making a term attention-calling. But the test is whether attention can reasonably be expected to be called to it."

Similarly, comment one to U.C.C. 2–316 notes that the Section is intended to allow exclusion of implied warranties "only by conspicuous language or other circumstances which protect the buyer from surprise."

There are numerous cases illustrating what such "other circumstances" might consist of. In *U. S. Fibres v. Proctor & Schwartz,* 509 F.2d 1043 (CA 6 1975), the court found exclusionary language in standard size type effective where the caption "LIABILITY CLAUSE" was in bold type and the evidence indicated buyer had reviewed the exclusion. *Smith v. Sharpensteen,* 521 P.2d 394 (Okl.1974), likewise held effective a disclaimer in inconspicuous print relying on its title of "No Warranty" and buyer's having been required to read it. A further example of "other circumstances" protecting the buyer from surprise is found in *Tennessee-Carolina Transport v. Strick,* 283 N.C. 423, 196 S.E.2d 711 (1973), where the court noted that a disclaimer should not be declared inoperative for inconspicuousness without inquiring whether the buyer was protected from surprise by factors bearing upon matters other than the physical appearance of the clause itself, e. g., actual awareness of a disclaimer running between non-consumer parties of substantially equal bargaining power. See also *Williams v. College Dodge,* 11 U.C.C.Rep. Serv. (Mich.Dist.Ct.1972).

The court determines that Section 8 of terms and conditions satisfies Section 2–316 by virtue of "other circumstances which protect the buyer from surprise." Cf. U.C.C. 2–316, Comment 1. Fargo's role in this transaction was as a sophisticated business buyer experienced in commercial dealings. When Kearney & Trecker submitted a quotation accompanied by "terms and conditions," Fargo attached it to its return order separately initialed by Fortunski, along with a rider stating additional terms and changing or deleting certain provisions which had been unacceptable to it. Clearly, these are the actions of a buyer in an equal bargaining position with his seller. In addition to the inference that the change in specific terms resulted from a detailed review of the "terms and conditions," Fortunski stated on cross-examination that he knew of the warranty paragraphs, had read them, and was familiar with what they contained. Furthermore, this involves no multi-page document with buried provisions; Section 8 is one of only fourteen separate sections on a single page, is the only one dealing with warranty obligations, and is bold titled "WARRANTY OF MATERIAL AND WORKMANSHIP." Under these circumstances, the court finds that such commercial buyers' actual awareness and apparent endorsement of the provisions obviates any need for conspicuousness in order to prevent surprise. The disclaimer of implied warranties of merchantability and fitness satisfies U.C.C. 2–316, and therefore is effective according to its terms.

Having concluded that only express warranties arose in this transaction,

the machine's claimed defects must be compared with these warranties to determine whether they constitute actionable breaches. A blind comparison of such express warranties with the machine's performance is not envisioned by the Code, however. Consistent with the Code's overall policy of commercial reasonableness, official comment 5 to Section 2–313 notes with regard to express warranties:

> "Of course, all descriptions by merchants must be read against the applicable trade usages with the general rules as to merchantability resolving any doubts."

Cf. § 1–205, Usage of Trade; § 2–314, Merchantability. Thus, the express warranties running to Fargo as well as Fargo's complaints must be read in terms of their significance in the machining trade and relative to what would normally pass in the trade without objection under the contract description. Notably, with regard to repairs, Fargo's expert, Fassey, testified not only that Fargo's $850.00 total expenditures through 1976 were remarkably low, but in addition, that a high degree of debugging is required on such machines and that normally the first five years of a machine of this nature often generate $5,000 to $10,000 in maintenance costs. As noted earlier, case law recognizes that such mechanical failures in new and complex machines are expected, and to the extent that deficiencies and corrective service performed were routine for so sophisticated a machine, no breach occurs. *N.C.R. v. Adell, supra.* Indeed, McCaffrey conceded from the stand that, although numerous problems developed at one time or another, most were of a minor nature, almost all were fixed by Kearney & Trecker promptly, and Fargo is left with relatively few defects which have any operational impact. Both the service reports and the lists of defects prepared by McCaffrey for payment conferences with Kearney & Trecker support this conclusion. Nearly all of the service reports, bearing McCaffrey's signature as chief engineer of Fargo, indicate the precise problems for which the service call was made and whether or not the job was completed. An uncompleted job was indicated only seven times after installation had been finished and four of these jobs were satisfactorily completed on follow-up calls.

McCaffrey's lists of defects prepared for the meetings of January, 1972 and October, 1972, similarly detail mostly problems which he admitted had been corrected promptly after being communicated to Kearney & Trecker.

■ In essence, Fargo's claim of remaining material defects may be reduced to three major problems which are at the root of Fargo's contention that the machine is not automatic but rather semi-automatic. Those three areas are (1) intermittent failure of the G–80z retract function, (2) failure of the zero speed detect device to prevent the machine from performing a low r. p. m. tapping function before the machine has actually slowed to the proper speed from higher drilling r. p. m.'s, and (3) malfunction in continuous tapping operations such that the machine stalls after several holes because it overloads from repeated reversals. McCaffrey testified that the principal difficulty in these problems is that if the malfunction occurs the work piece or tool may be ruined, and if the machine stalls, resolving the problem usually means loss of position, synchronization, and programmed information. To prevent this, McCaffrey programs the H–100 to stop at potential trouble spots so that he can determine whether the machine can continue safely or requires manual intervention. Absent the necessity for the chief engineer's skilled supervision, the operation of such a machine would normally be entrusted to a machine operator at considerably less expense to Fargo and freeing McCaffrey for other productive work. With reference to these three primary complaints, the court holds that the evidence has demonstrated that the defects are significant and that their operational impact breaches the express warranty of description and the express warranty that the machine would perform fully automated small lot production.

■ Further, the court finds that although there has been no showing of the

precise technical explanation behind the malfunctions, that burden is not cast on the buyer of defective goods. Cf. *Rex Paper Co. v. Reichhold Chemicals, Inc.*, 252 F.Supp. 314 (W.D.Mich.1966). It is sufficient for him to show that the goods simply do not conform to the warranty, that he notified the seller within a reasonable time, and that he suffered loss as a proximate result of the non-conformity. U.C.C. § 2–714. If misuse or fault on the buyer's part has contributed to or caused non-conformity, that is a matter which seller clearly may raise. See U.C.C. § 2–314, Comment 13. As to the breaches noted above, the court finds that no evidence has been submitted on which it could find Fargo bore any degree of responsibility for these non-conformities.

■ Fargo claims it suffered an additional breach in not having received incremental programming capability (GO6) in an option it ordered as represented in the general specifications Kearney & Trecker supplied. This capability was listed as a separate option, but the specifications noted that it was included in a more expensive option which Fargo did order. Although there appeared to be some question as to whether the language indicating it would be "included" had been blacked out on a copy of specifications referred to in Racine, the testimony of Fortunski and McCaffrey indicated that Kearney & Trecker supplied and referred them to a number of copies of the general specifications at various times and that no particular changes or alterations of the Racine copy were ever pointed out. Since the Kearney & Trecker sales representative attached unmarked specifications to the quotation he sent Fargo and Fargo incorporated those specifications by reference in the purchase order, the court finds that the failure of Kearney & Trecker to provide the GO6 function breached an express warranty of description.

Fargo also claims that Kearney & Trecker's inability to provide spare parts was contrary to its express representation that it bore single point responsibility for replacement of defective parts. An incident involving eighteen days of down time in August of 1973 is asserted as having resulted from Kearney & Trecker's not stocking spare modules for the H–100. At the onset of the breakdown, a Gorton electrical engineer advised Fargo by phone that three modules were the potential trouble sources but that none were in stock. Fargo immediately contacted Allen-Bradley but two of the modules were not in Allen-Bradley's stock either, and repair was the only alternative. Although Allen-Bradley repaired and returned one board with reasonable promptness, that did not correct the problem and the bulk of the eighteen days resulted from the delay necessary to have Allen-Bradley isolate and service the precise cause of the breakdown on the other boards.

■ A fundamental purpose of modular components is to enable the user to keep costly down time to a minimum by simply substituting a replacement module when something goes wrong in the original one— thus getting operative again without having to locate and repair the actual defect. Where the manufacturer simply does not have spare parts in stock, that advantage disappears and the entire principle of single point responsibility for replacement of defective parts is of no value. Both Fassey and Martins testified to the critical role parts availability plays in efficient "serviceability." Kearney & Trecker's apparent inability to provide spare parts breached its express undertaking of sole responsibility for replacement and directly resulted in damage to Fargo consisting of an unduly long period of down time in connection with this incident.

With respect to Fargo's further allegations of instances in which Kearney & Trecker could not supply a specific replacement part, e. g., reader lamps, the court found that the proofs revealed the lamps *were* available from Kearney & Trecker but at a price greater than Fargo wanted to pay, and that Fargo found another source at a satisfactory price anyway. Additional factual issues were raised relative to availability of spare parts, but the court finds

that none rose to a more significant level than minor communication gaps between the parties from which Fargo sustained no demonstrable damage.

█ With reference to these actionable complaints, the Uniform Commercial Code poses a procedural hurdle in the notice provision of Section 2–607(3):

"(3) Where a tender has been accepted

(a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy;"

Official comment 4 explains:

"The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (Section 2–605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation."

Further, it is recognized that notice of breach of warranty under the Code is intended to be less rigorous than that required by the former sales act. *Nugent v. Popular Markets, Inc.,* 353 Mass. 45, 228 N.E.2d 91 (1967).

█ Notably, this is not a case where the buyer has failed to give notice of any breach, then sought to raise breach of warranty when seller sued for the price. Rather, Fargo falls squarely within comment 4, *supra,* having formally indicated from the date installation was "completed" and every six months thereafter at payment meetings that various claimed breaches were involved and that the transaction was still trouble-

some. Clearly, there was no question on the part of Kearney & Trecker that breaches were claimed to exist; the negotiations over payment, the number and duration of service calls, the extension of warranty benefits through March of 1973, and Kearney & Trecker's offer at the last meeting proposing a further warranty extension all demonstrate an acute sense of awareness on seller's part that the buyer was not satisfied. With regard to those defects which did not surface until late in the transaction (i. e. GO6 programming capability not included in an ordered option and that the G–80z retract intermittently malfunctioned), the court finds that notice was given to Kearney & Trecker without prejudice or unreasonable delay in light of the difficulty of discovery and the pendency of litigation between the parties. Cf. *Kaiser Cement & Gypsum Corp. v. Allis-Chalmers Manufacturing Company,* 35 Cal.App.3d 948, 111 Cal.Rptr. 210 (1973).

Fargo claims that additional breaches of lesser significance are involved in its dissatisfaction with the H–100 but the evidence offered fails to establish that Fargo has an actionable claim for substantial damage caused by such "defects."

A considerable amount of time and effort was spent on the question of whether Kearney & Trecker provided adequate documentation and drawings for the H–100. Although McCaffrey testified that the documentation delivered with the machine was incomplete, on cross examination he conceded that of the thirteen manuals and two addendums in Fargo's possession, he had not compared most of the drawings with circuitry, had only skimmed those manuals which he had read at all, actually *did* have information in portions of the manuals he had not consulted covering certain alleged gaps (e. g., the tool changer and spindle), and further, that he had obtained other "missing" documentation directly from Allen-Bradley, Jordon, and Inland Drives relative to the components they had supplied. Even plaintiff's expert Herbert Martins, although testifying on direct that Fargo's module drawings were incomplete, admit-

ted when directed to specific parts of the Allen-Bradley manual on cross, that a knowledgeable person could order components by referring to the manual and the board itself. Allen-Bradley's field service manager, Richard Martin, pointed out that composite drawings in the Allen-Bradley manual covered an "SYC" module which Herbert Martins had concluded was missing and further, that at no time was Allen-Bradley unable to service the H–100 using only Fargo's drawings.

■ Fargo similarly offered no evidence of having ever actually been unable to obtain service because of inadequate documentation. What remains of Fargo's documentation complaints in essence are three modules with additions not noted on the drawings (all of which modules are perfectly functional according to Martins and serviceable according to Martin) and no drawings for the zero speed detect device, the load meter, or the power supply. Plaintiff's own expert, Martins, testified that a knowledgeable electrical engineer could service both the load meter and the zero speed detect without further documentation and the power supply, as considered, *infra,* has been properly serviced by Allen-Bradley to date. The court finds that Fargo offered almost no evidence tending to indicate that it at any time was unable to obtain service or repairs on these items or suffered an ascertainable amount of damage because of any deficiency in documentation; only with respect to the load meter does the court find a showing of damage, in that its low cost would clearly be exceeded by the cost of repair by an electrical engineer rather than a serviceman. The applicability of Joint Industrial Council Standards and the issue of compliance is mooted by Fargo's having acquired a substantially complete set of drawings and not having demonstrated any damage sustained by the minor gaps that remain, with the exception of the load meter.

Another area receiving considerable attention was the failure of three amplifiers allegedly due to heat build-up within the cabinet that housed them. Kearney & Trecker replaced two amps during the first two months Fargo had the H–100 and a third approximately one year later in November of 1972. After the first two replacements, Kearney & Trecker installed two exhaust fans at the top of the cabinet to circulate the air inside. When the third failure occurred, a Kearney & Trecker service man removed the intake filters from the bottom of the cabinet to increase the circulation. Subsequently, Fargo abandoned that system altogether and simply left the cabinet doors themselves open. No further failures have occurred since November, 1972 even in the hottest summer months, and the amplifiers which did fail were replaced under warranty without charge (except the last which was not returned by Fargo to Kearney & Trecker as is required for credit). Fargo complains, however, that the open cabinet allows dirt to reach components and is unsafe due to exposed circuitry. Had Fargo not ignored the fan system in favor of its own alternative, the court would be inclined to view this claim more favorably. However, Fargo's expert, Fassey, could not say that heat was directly responsible for the 1972 failure even after examining the failed amplifier which had not been returned. Further, his tests of operating temperatures in the cabinet with the fans in use indicate that only under the most extreme load and unusually hot shop climate could the temperature actually reach recommended maximum tolerance for the amplifiers. Moreover, to the extent that Fargo's premises have the capacity to produce such temperature extremes, Joint Industrial Council electrical standards recommend that the buyer specify on his inquiry and purchase order certain additional details of his local requirements including conditions for which unusual provisions must be made, such as "ambient temperature over 40° C" (104° F). J.I.C. Standard E 1.9(7)d. McCaffrey's testimony indicated that the shop's temperature in the summer approaches that level, and Fargo's failure to so specify on its order is inconsistent with its claiming that if the fan system is inadequate Kearney & Trecker is responsible.

■ With regard to Fargo's contention that it received an untried prototype machine, the court finds that the evidence does not support plaintiff's claim, and further, that Fargo has waived any rights it may have had as to this issue. The testimony of the Allen-Bradley field service manager indicated that although the machine was considered the first "P.I." or "product improved" machine, the only changes necessitated in the circuit boards involved three or four modules; that the control basically already had dual compatibility for hydraulic or electric drive and that the latter was really a simpler system; that only two unusual shake-down problems were encountered when the machine was married to the control, and they were completely corrected; and that a full set of prints was available when the control was shipped to Kearney & Trecker. Further, the Gorton H–60 machining portion was a tested and proven machine and differed from the H–100 in a practical sense only in the smaller size of the table on the H–60 and the installation of electric rather than hydraulic drive in the H–100. The electric drives were tried and proven and manufactured by a reputable source, Inland Drives, which supplied and was servicing the drive system in another of Fargo's machines.

■ Webster's Unabridged Third New International Dictionary defines prototype as "the first full scale model of a new type or design of furniture, machinery, or vehicle." The history of manufacture behind the machine at bar indicates that this was not a prototype, but rather more in the nature of an established machine with new options or accessories. Moreover, and most importantly, however, Fargo was notified while the machine was being fabricated that electric rather than hydraulic drives were to be used as an improvement. Fargo raised no objection at that time or at any later time until litigation commenced. Under these circumstances, the court finds that the H–100 was not a prototype and that Fargo waived any rights it may have had relative to the improvements proposed by Kearney & Trecker.

■ Fargo has also experienced problems with the power supply unit for the H–100, but the court finds that the interim between the original replacement in 1971 and the second replacement in 1975 with a rebuilt unit was not unreasonably short. Although Fassey testified that the service life may range from five to ten years, he also noted on cross-examination that power supplies are usually warranted for only one year. The court is constrained to find that at this stage of the machine's life expectancy, problem areas which are developing after a reasonable period of trouble free operation in such areas do not sufficiently demonstrate that they are the result of breach of warranty rather than merely the sign of an aging machine.

### Revocation of Acceptance

■ The court's finding that there has been a breach of warranty in the machine's inability to operate in an automatic manner has separate consequences relative to Fargo's two separate theories, breach of warranty and revocation of acceptance. As noted, plaintiff's case in breach of warranty is made out by the demonstration of the existence of a warranty, breach, notice, and proximately resulting damage. However, it is not every breach of warranty which will entitle a buyer to revoke his acceptance under § 2–608 which requires, *inter alia,* that such breach constitutes a substantial impairment in value to the buyer. *Overland Bond & Investment Corp. v. Howard,* 9 Ill.App.3d 348, 292 N.E.2d 168 (1972).

Uniform Commercial Code § 2–608 provides:

"*Revocation of Acceptance in Whole or in Part:*

"(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

"(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

"(b) without discovery of such non-conformity if his acceptance was rea-

sonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

"(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it

"(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."

■ Of controlling importance at bar are the requirements (1) that the buyer notify the seller of his revocation, (2) that the revocation occur within a reasonable time after discovery of the grounds, (3) that the non-conformity substantially impair the value of the goods to plaintiff, and (4) that the revocation occur before any substantial change in the condition of the goods which is not caused by their own defect.

■ At bar, the evidence is not entirely clear relative to when Fargo intended its revocation to occur or when notice of such alleged revocation was given. Section 2–608(3) provides that a buyer who revokes his acceptance has the same rights and duties with regard to goods as if he had rejected them, and Section 2–602(2)(a) and (b) indicate that after rejection any exercise of ownership by the buyer is wrongful (except to store or dispose of the goods for seller's benefit or pursuant to seller's instructions). Thus, although notice of revocation need not be in any particular form, it must at least inform the seller that the buyer does not want the goods and does not desire to retain them. See *Hayes Merchandise Inc. v. Dewey,* 78 Wash.2d 343, 474 P.2d 270 (1970), where after notice of intent to revoke acceptance, the buyer's pricing, advertising, and selling were not in keeping with his duty to use reasonable care in holding goods at the seller's disposition for a reasonable time. The pre-code remedy of recission similarly required that buyer's notice unequivocally demonstrate intent to terminate the contract and discontinue possession. See *MacLaren v. Dermody White Truck Company,* 9 Mich.App. 402, 157 N.W.2d 459 (1968).

■ Revocation of acceptance under the Uniform Commercial Code, however, does not impose an absolute bar to continued use of the goods, as did recission, since, under certain circumstances, it may be the only reasonable way to mitigate damages. Cf. *Fablok Mills, Inc. v. Cocker Machine & Foundry,* 125 N.J.Super. 251, 310 A.2d 491 (1973) (question of fact whether buyer's continued use waived right to revocation where alternative was going out of business because seller was *only* supplier of machine); *Minsel v. El Rancho Mobile Home Center,* 32 Mich.App. 10, 188 N.W.2d 9 (1971) (continued use did not negate revocation claim where plaintiff was unable to find another place to live and failed to vacate trailer for six weeks after notice of revocation, but did vacate as soon as possible and defendant failed to show any resulting prejudice). See also *Richardson v. Messina,* 361 Mich. 364, 105 N.W.2d 153 (1960). The court does not feel that the circumstances at bar are analogous to the exceptional cases noted. Fortunski testified that Fargo considered a number of similar machines before choosing the H–100; thus, had Fargo actually desired to rid itself of the machine, it could have obtained alternative equipment to perform the H–100's function. Furthermore, Fargo did not merely temporarily delay discontinuing use because of exigent circumstances, but rather, appears to never have intended to take the H–100 out of production.

Fargo's conduct at all times until suit commenced was inconsistent with a revocation of acceptance. At the meeting early in 1972, Fargo complained of uncured defects but paid $28,000 on the balance due and continued to possess and use the machine. Similarly, at the meeting in October of 1972, plaintiffs again raised specific grievances, and again did not indicate to Kearney & Trecker that it no longer wanted the machine. Indeed, production continued as usual and additional service calls and re-

pairs were made in response to plaintiff's complaints. Even at the meeting of March 1, 1973, although Fortunski refused to open an envelope containing Kearney & Trecker's latest proposal for resolution, he manifested no intent to consider the contract at an end and Fargo continued production with the H–100. Two more service calls followed before suit was commenced in Wisconsin by Kearney & Trecker on April 6, 1973. Even at this juncture, with seller seeking to compel payment of the full purchase price, Fargo gave no indication that it was prepared to revoke acceptance *and answered in the action with a counterclaim for damages only,* alleging breach of warranty. Indeed, McCaffrey's deposition in January of 1975 indicates that, at that time, Fargo's intention was *still* to keep the machine in operation. The complaint that Fargo filed in Michigan two days after the Wisconsin action had been instituted did, however, allege that Fargo had requested Kearney & Trecker to accept delivery of the machine back and to refund the $103,725.00 in purchase money already paid, but neither the correspondence between the parties nor the testimony at trial substantiates such notice having actually occurred prior to suit. Furthermore, Fargo did not assert its theory of revocation of acceptance *as such* until a pre-trial order issued in July of 1975. Neither Fargo's First or Second Amended Complaint went further than to claim money paid as an element in what appeared as ordinary damages action. There is, however, authority for the proposition that commencement of suit to reclaim the purchase price in itself constitutes notice and an offer to rescind, see *Limoli v. Accettullo,* 358 Mass. 381, 265 N.E.2d 92 (1970); *Fenton v. Contemporary Development Co., Inc.,* 12 Wash.App. 345, 529 P.2d 883 (1974), and for the sake of argument, the court will assume that plaintiff's conduct in continuing use of the H–100 and obtaining further repairs from third parties was not so inconsistent therewith as to render such notice ineffective.

 Timeliness is a related but independent consideration and whether buyer has revoked within a reasonable time after he discovered or should have discovered non-conformity depends on the particular circumstances of the case. Indeed, case law uniformly recognizes that complicated machinery and systems may have relatively long ironing out periods during which the buyer in good faith continuously attempts to have the seller cure or repair complicated problems. Accordingly, courts have held that revocation in such circumstances is not unreasonably delayed where buyer promptly notifies seller of the defects, attempts at cure are ongoing, and buyer does not formally notify of revocation until it is apparent that seller cannot perform repairs. See *Dopieralla v. Arkansas-Louisiana Gas,* 255 Ark. 150, 499 S.W.2d 610 (1973) (forty-month delay after installation was not unreasonable for heating/air conditioning system); *Fablok Mills v. Cocker Machine & Foundry Co., supra,* (two-year delay was not unreasonable for knitting machines); *Regents, The University of Colorado v. Pacific Pump,* 35 Colo.App. 36, 528 P.2d 941 (1974) (three-year delay was not unreasonable for a power plant). At bar, assuming that Fargo's institution of suit constituted notice of revocation, the time that had elapsed since installation was approximately eighteen months. Repairs had been "continuously" attempted in the sense that Kearney & Trecker's last service call was made less than three weeks before suit was filed, although repairs on the three principal complaints had not been attempted for some time, and the majority of calls were for unrelated problems which were corrected. However, assuming arguendo that commencing suit was an unequivocal notice of revocation *and* that it was timely, the court finds the most difficulty in meeting the remaining requirements of § 2–608, substantial impairment in value and revocation before a substantial change in the condition of the goods has occurred.

 In regard to the impairment in value question, although it is a subjective issue aimed at determining impairment to this particular buyer, it is best resolved as a factual question by the trial court based on objective evidence rather than on the basis of the buyer's personal belief. *Hayes Mer-*

*chandise v. Dewey, supra.* The court notes that on the evidence properly before it, there is not a substantial enough showing of damage to warrant the conclusion that the defects complained of substantially impaired the value of the machine to Fargo.

A number of facts support the court's decision in this regard. First, although suit was commenced one and one-half years after installation, trial in this matter did not begin until December of 1976. Prior to September of 1973, Fargo could complain of only one period when the machine was actually down and no incidents where a work piece was damaged or defectively machined or a job refused or finished late because of the H–100. That situation has not changed in almost four more years. McCaffrey's testimony confirms that he has been able to successfully program around hazards but at the expense of his increased attention to the machine.

Further, in the nearly five and one-half years (of a total seven to ten year life expectancy) that Fargo has operated this machine and substantially depreciated it tax-wise, it has apparently been used to at least the same productive extent as is normally expected of such a machine. In June of 1972, nine months after it began using the H–100, Fargo installed two meters, one to measure the hours of on-time and the other to measure hours of actual machine operation or spindle time. Between the installation of the meters and July of 1974, the machine ran 2,878 spindle hours. Between January, 1975 and October, 1976, the machine ran roughly 3,300 additional spindle hours. Plaintiff's expert, Fassey, testified on cross that spindle time of fifty to seventy-five percent of a forty hour week was optimum usage for such a machine and that the meters indicated "extensive use" of the H–100. For the two periods noted, usage rates above 70 percent were generated.

Martin, Allen-Bradley's field service manager, testified that projecting the spindle hours at more than 7,000 as of trial, Fargo had obtained an over all usage rate of about seventy-six percent since the meters were installed. Although the court recognizes that spindle time does not conclusively demonstrate productivity, the court notes Fargo made no effort to disprove the apparent fact that the defects complained of have had little, if any, impact on the ultimate productive use of the H–100.

Moreover, to the extent that Fargo alleges substantial impairment of value in the amount of servicing that the machine has required, the court finds that the evidence has been unsupportive. The Kearney & Trecker service reports number eighteen between the time installation was completed and commencement of litigation one and one-half years later. All of the service was performed without cost under the original warranty or the six-month extension. Since that time, Fargo has obtained service primarily from Allen-Bradley and, to the date of trial, has expended only approximately $850.00 in total on maintaining this machine. In addition, so far as McCaffrey's admitted failure to attend the free Allen-Bradley or Kearney & Trecker maintenance schools or follow the program set out in the Owner's Preventive Maintenance Guide is concerned, grounds exist to infer that plaintiff itself may be responsible in part for the servicing that has been necessary. Both plaintiff's experts testified that maintenance and repairs are a substantial expense during the early life of a machine of this complexity, Fassey estimating that an investment of between $5,000 and $10,000 in the first five years would be normal. Even, however, if Fargo were out-of-pocket a more substantial amount, the dollar value of necessary repairs need not be compared with the machine's cost to appraise a percentage of impairment; rather, the court must look to the effect of the impairment on the user. *Overland Bond & Investment Corporation v. Howard, supra.* In this respect, Fargo's extensive use of the H–100 to date, absent a showing that such use was not normally productive, is a clear indication that the effect on the user was not substantially adverse.

In the aggregate, these factors militate strongly against granting Fargo the

harsh remedy of revoking its acceptance and casting back into the lap of Kearney & Trecker a machine which has been used productively for the major part of its life expectancy. This problem also bears very strongly on the requirement of Section 2–608(2) that revocation occur before there is a substantial change in the goods' condition not caused by their own defect. Although Fargo urges that its revocation occurred when the machine was only one and one-half years old, as noted earlier, both the doctrine of recission and the Code remedy of revocation generally instruct the buyer to hold the goods for the seller's benefit. The H–100's use and depreciation by buyer over a period beginning to approach its life expectancy most clearly constitutes a substantial change in the condition of the goods. Although only one and one-half years had elapsed by the time Fargo commenced suit, more than twice that period has elapsed since and Fargo's conduct throughout has indicated a clear intent to keep the machine in production and reap all the benefits that would normally attach to ownership.

Accordingly, the court finds that Fargo's theory of revocation of acceptance cannot be sustained and that any recovery by plaintiff must arise under its breach of warranty theory.

*Damages*

It is necessary before considering those aspects in which Fargo alleges damage to determine whether, by agreement, the parties have eliminated any elements of damages. Section 8 of Terms and Conditions, referred to earlier, provides as relevant here:

"Seller shall not be liable for loss of profits or consequential damages and seller's maximum liability under no circumstances shall exceed the replacement of the part or product or at seller's option, the repurchase at buyer's purchase price of the product."

The Uniform Commercial Code section governing the effect of this language is 2–719,

"Contractual Modification or Limitation of Remedy", providing, in subsections (2) and (3):

"(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.

"(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

Since under § 2–719 conspicuousness is irrelevant, it appears from the face of the statute that, unless unconscionable or causing a limited remedy to fail of its essential purpose, this limitation on damages is effective. Notably, unconscionability rarely exists in a commercial setting involving parties of equal bargaining power. *County Asphalt, Inc. v. Lewis Welding & Engineering Corp.*, 323 F.Supp. 1300, aff'd, 444 F.2d 372 (CA 2 1970), cert. denied, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971). There is no evidence before this court tending to imply that any disparity in bargaining power existed or that oppression or unfair surprise existed. Cf. U.C.C. § 2–302, Comment 1; *Campbell Soup v. Wentz*, 172 F.2d 80 (CA 3 1948).

On the other hand, seller has effectively disclaimed implied warranties and has limited buyer's remedy on the express warranty to repair or replacement of defective parts with consequential damages excluded. Had the numerous repairs seller performed actually remedied the principal defects in the H–100 and enabled it to run as an automatic machine should have, buyer's remedy for breach would have been meaningful. As circumstances stand, the repairs were not effective to completely cure the breach and make the machine operate in an automatic fashion, yet buyer has now exhausted the limited remedy afforded him. Where such circumstances cause a limited remedy to fail of its essential pur-

pose, subsection (3) of 2–719 provides that buyer may have his remedy as provided by the Code generally. Accordingly, the court holds that the limitation of buyer's remedy to repair or replacement is inoperative and the Code's remedy, an action for damages under 2–714 and 2–715, is available. *Eckstein v. Cummins,* 41 Ohio App.2d 1, 321 N.E.2d 897 (1974).

Whether the exclusion of consequential damages may stand independent of the stricken limitation or is an elaboration on it which should also be avoided remains to be determined. *Koehring Company v. A.P.I. Inc.,* 369 F.Supp. 882 (E.D.Mich.1974) considered the same question on similar facts and held the consequential damages exclusion inoperative, finding that it would not be equitable to allow the seller to fail to perform the one remedy available to buyer and then be freed of any responsibility caused by that failure. The court noted:

"In a sense, there are two breaches of the contract; the first being the failure to deliver goods conforming to the express warranty, and the second being the failure to correct the non-conformity as was promised in the party's agreement."

Similarly, in *Beal v. General Motors Corp.,* 354 F.Supp. 423 (D.Del.1973), the court denied a motion to strike allegations of consequential damages despite an apparently valid exclusionary clause regarding such damages. The court there noted:

"The purpose of an exclusive remedy of replacement or repair of defective parts, whose presence constitute a breach of an express warranty, is to give the seller an opportunity to make the goods conforming while limiting the risks to which he is subject by excluding direct and consequential damages that might otherwise arise. From the point of view of the buyer the purpose of the exclusive remedy is to give him goods that conform to the contract within a reasonable time after a defective part is discovered. When the warrantor fails to correct the defect as promised within a reasonable time he is liable for a breach of that warranty. (Citations omitted.) The limited, exclu-

sive remedy fails of its purpose and is thus avoided under § 2–719(2), whenever the warrantor fails to correct the defect within a reasonable period." 354 F.Supp. at 426.

See also *Jorgenson v. Mark Construction Co.,* 540 P.2d 978 (Haw.1975); *Ehlers v. Chrysler Motor,* 226 N.E.2d 157 (S.D.1975).

■ The court finds this authority persuasive and holds that the exclusion of consequential damages and lost profits at bar is ineffective to limit plaintiff's recovery of damages as provided in U.C.C. § 2–714 and § 2–715.

Section 2–714 provides the rule for "Buyer's Damages for Breach in Regard to Accepted Goods":

"(1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2–607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

"(3) In a proper case any incidental and consequential damages under the next section may also be recovered."

■ Although the ordinary measure, as provided in subsection (2) is usually the keystone for computing buyer's damages, *Valley Die Cast Corp. v. A.C.W., Inc.,* 25 Mich.App. 321, 181 N.W.2d 303 (1970), *plaintiff has foreclosed this measure from the court's consideration by failing to either allege or offer proof on the issue of the "value of the goods accepted," i. e., in their defective state.* Damages, like any other element of plaintiff's cause of action, must be pled and proved, and the burden is on plaintiff to offer evidence of difference in value if the judgment is to be based on that measure. *Neuman v. Spector Wrecking &*

*Salvage,* 490 S.W.2d 875 (Tex.Civ.App. 1973); *Dolomite Limestone Products v. Kennedy-Van Saun Manufacturing & Engineering Corp.,* 241 Mich. 279, 217 N.W. 26 (1928). In the absence of evidence demonstrating the amount of damage suffered, a buyer is not entitled to recover from seller for breach of warranty. *Opheim v. United Mobile Homes,* 511 P.2d 1289 (Wyo.1973).

 Subsection (1) of 2–714, notably, provides an alternate rule allowing the computation of buyer's loss "in any manner which is reasonable." Thus, e. g., if the goods can be made to conform to the warranty by a reasonable expenditure, the cost of such expenditures may be the measure of damages for the breach. *Council Bros., Inc. v. Ray Burner Co.,* 473 F.2d 400 (CA 5 1973); *Meyers v. Antone,* 227 A.2d 56 (D.C. App.1967). *Plaintiff, however, has offered no evidence of what such expenditures might amount to even though both plaintiff's experts appeared fully capable of offering such opinions based on their examinations of the H–100's defects.*

▪ The evidence plaintiff did submit which substantially bore on the damages issue presents the court with serious difficulties. Fargo maintained that the principal loss caused by the H–100's inability to function automatically was that the chief engineer was required to supervise its operation to a greater degree than should be required by an automatic machine. Fortunski testified that McCaffrey spent an average of fifty percent of his time on the H–100. To convert this evidence into a concrete damages figure, the court would have to speculate on a considerable number of additional variables. McCaffrey's responsibilities included another numerically controlled machine when the H–100 was purchased, and subsequently encompassed a third such machine. No evidence indicates what percentage of McCaffrey's time would have been normally attributable to the H–100 during the relevant periods. It was the most sophisticated of the three machines, McCaffrey was the only graduate engineer with a numerical control background at Fargo, and programming was solely his responsibility. Also, although McCaffrey testified that he took work home with him periodically, there was no testimony that McCaffrey specifically had to forego other obligations because of the increased time spent on the H–100. It also is a fair inference that Fargo has accommodated itself to the machine's alleged deficiencies and that McCaffrey is now spending proportionately less time "baby sitting" the H–100. The court cannot arbitrarily establish the percentage of McCaffrey's time which the H–100 would have required had it been reasonably free of defects, and absent that factor, damages cannot be measured by the method proposed.

 The court, however, does find that certain evidence submitted by Fargo proves ascertainable amounts of damage. The incremental programming function (GO6) which was ordered as an option but not included is listed in the general specifications at a cost of $800.00, and accordingly, Fargo is entitled to recover such amount. Similarly, the load meter option with an estimated cost of $100.00 has clearly never functioned properly. As noted earlier, the cost of repair by an engineer who can service the meter without drawings exceeds the meter's cost and, in effect, deprives Fargo of the meter's value in the amount of its cost.

 In addition, a discernible amount of the service calls performed by Allen-Bradley after Fargo and Kearney & Trecker had terminated relations were performed on certain uncured problems which Kearney & Trecker had earlier attempted to remedy, i. e., recurrent slide hold switch malfunctions, or which contributed to the machine's inability to function automatically, i. e., the G–80z retract malfunction. To that extent, which the court computes from the service reports at $200.00, those service costs are construed as reasonable expenditures to make the goods conform to warranty and are within the rule of *Meyers v. Antone, supra,* as a measure of buyer's damage.

 Similarly, the court finds that Fargo has shown with reasonable certainty that it sustained damages as a result of

Kearney & Trecker's inability to provide a replacement module for the H–100 pursuant to its assumption of single point responsibility for repair and replacement of defective parts. Had spare modules been in stock and available when the eighteen-day siege occurred, Fargo could have ordered and received the necessary boards to keep the machine running, at worst, in no more time than it took to send and receive back the board which went to Allen-Bradley for repair. Thus, Fargo's eighteen-day siege, reduced by three days' reasonable delay to obtain the spare boards and reduced by four intervening· weekend days, resulted in an actual loss to Fargo of eleven work days. The testimony supports a profit rate of approximately $30.00 per machine hour, or a total of $2,640.00 in lost profits for the period.

The counter-claims of defendant Kearney & Trecker remain to be formally disposed of. The court finds for Kearney & Trecker on its claim for the remaining balance due on the purchase price of the H–100 in the amount of fifty thousand ($50,000.00) dollars. Kearney & Trecker also claims $2,016.50 as the price of a replacement amplifier supplied to Fargo in 1972 on terms providing for credit upon return of the faulty amplifier, which was not returned. The court will allow Fargo the option of returning the defective amplifier for credit within a reasonable time after entry of this judgment or paying Kearney & Trecker the additional amount of $2,016.50.

Accordingly, the damages awarded to plaintiff Fargo Machine and Tool Company are set off against the damages awarded to Kearney & Trecker, and Judgment shall be entered on Kearney & Trecker's behalf in the amount of Forty Six Thousand Two Hundred Sixty Dollars ($46,260.00), subject to an increase of $2,016.50 should Fargo fail to timely return the replacement amplifier as hereinbefore provided.