COLLINS RADIO COMPANY OF DALLAS, TEXAS, a division of Rockwell International, Appellant and Cross-Appellee,

v.

R. B. BELL and Bernice Bell, d/b/a LeFlore County Broadcasting Company, Appellees and Counter-Appellants,

v.

Zelman GARNER d/b/a Garner Electric Company, and John Shideler, Appellees as to Cross-Appeal only.

No. 51237.

Court of Appeals of Oklahoma, Division No. 1.

Oct. 7, 1980.

Rehearing Denied Dec. 16, 1980.

Certiorari Denied Feb. 2, 1981.

Released for Publication by Order of Court of Appeals Feb. 5, 1981.

Mandate Recalled Feb. 23, 1981.

Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick by Clyde A. Muchmore, Oklahoma City, for appellant and cross-appellee.

Benjamin J. Curtis, Poteau, for appellees and counter-appellants.

Alpheus Varner, Poteau, for appellees as to cross-appeal only.

Cooper, Stewart & Elder by B. J. Cooper, Oklahoma City, for amicus curiae.

ROMANG, Judge:

An appeal by Collins Radio Company of Dallas, Texas, from a jury verdict against it on the counter petition of R. B. Bell and Bernice Bell, d/b/a LeFlore County Broadcasting Company, in a breach of warranty action based upon a written contract allegedly enlarged by oral agreements. Bell has counter appealed against Collins and has separately appealed from a jury verdict for Zelman Garner, d/b/a Garner Electric Company, who was a third party defendant in this action.

The controversy between Bell and Collins arose out of the sale of certain pieces of FM radio transmitting equipment by Collins to Bell under a written sales contract. Bell accepted the equipment, made a down payment on it, and used it for over two years, but never paid the balance due. Collins sued Bell to recover the purchase price. Bell counterclaimed against Collins alleging that the written contract did not encompass

the entire agreement of the parties. Therefore, according to Bell, Collins had breached the implied warranties of merchantability and fitness for a particular purpose under the written contract, and had also breached express oral warranties covering design, appearance, performance, dimensions, maintenance, and operation with respect to the largest piece of equipment purchased—the FM transmitter. Bell sought $826,786.87 in actual damages. Additionally, Bell alleged two causes of action sounding in tort. The allegations under the second and third causes of action are less than clear, but it appears that Bell sought to impose punitive damages against Collins upon allegations that certain actions of Collins were wilfull and malicious, causing damage to the professional reputation of Bell, and that these same actions were calculated to injure Bell in the pursuance of his occupation.

Bell made Zelman Garner, d/b/a Garner Electric Company, a third party defendant. Under a written contract between these two parties Garner was to construct the facility that was to house the FM equipment, install heating and air-conditioning, install some of the transmitting equipment, and provide a phaseconverter. The allegations of Bell's position against Garner were that he had not done the work in a workmanlike manner and had breached implied and express warranties under the sales contract for the phaseconverter. A major issue below and on appeal is whether the phaseconverter—referred to throughout the trial by its brand name, Rotoverter—was a cause of transmitter failure. The Rotoverter was necessary because Bell had available only one-phase electricity, whereas FM transmitters utilize three-phase electricity. Its function was to convert the one-phase to three-phase electricity.

For the FM station to broadcast continuously during its air time, it was imperative that Collins' transmitter and the Rotoverter work together. They did not, and the result was that the station experienced considerable amounts of downtime. Several other factors are present, but the downtime is the major basis for Bell's alleged damages against both Collins and Garner.

At the close of all evidence the trial court entered a directed verdict for Collins for the purchase price of the equipment, $64,788.03. The jury returned a verdict against Collins on Bell's first cause of action for $200,000.00, but found against Bell and for Collins on Bell's second and third causes of action, those sounding in tort. The jury returned a verdict for Garner on Bell's action against him.

Bell successfully sought a writ of mandamus in the Supreme Court. Thereunder, the Court, pursuant to 12 O.S. 1971, § 699, directed the trial court to grant Bell a judgment against Collins for the excess of their award over the judgment for Collins. The amount of this judgment is challenged on appeal, but we need not address this issue because of our disposition of the case.

Both Collins and Bell appealed. By order of the Supreme Court the Collins appeal was designated as the principal appeal, and Bell's appeal was designated as the counter appeal. Bell also appealed from the jury verdict for Garner.

There are three sets of parties to this appeal. We address the issues with respect to these parties separately.

## I. Bell v. Garner

■ The jury was properly instructed as to the causes of actions that Bell had alleged against Garner. Upon conflicting evidence the jury found that Garner had not breached any warranties under the contract or performed any work in an unworkmanlike manner. A review of the voluminous record reveals that there was competent evidence to support the verdict, therefore it is affirmed. *Hames v. Anderson*, 571 P.2d 831, 833.

## II. Collins v. Bell

■ The trial court directed a verdict for the purchase price of the equipment on

Collins' petition and evidence. In a later hearing Collins was granted attorney's fees. Although Bell alleged that the directed verdict was contrary to the law, and not sustained by the evidence, and that the attorney's fee was excessive, he failed to brief or argue these assertions on appeal. The assertions are therefore deemed waived and will not be considered by this Court. *Higdon v. Henderson*, 304 P.2d 1001, 1002. The directed verdict for Collins and the attorney's fee awarded stand.

### III. Bell v. Collins

Collins at the close of all evidence moved for a directed verdict as to the two tort theories and the breach of warranty theory. The trial court overruled the motion, and the three causes of action against Collins were submitted to the jury. Bell does not challenge the jury verdict for Collins on the two tort causes of action. *Greene v. Circle Ins. Co.*, 557 P.2d 422, 423; *Mills v. Lester*, 169 Okl. 344, 37 P.2d 261, 262. The two tort theories are not before us.

On the breach of warranty action against Collins, we have carefully reviewed the entire record and find for reasons set out in the remainder of this opinion that there is no evidence reasonably supporting the judgment and verdict. We therefore reverse that judgment. *Green v. Safeway Stores, Inc.*, 541 P.2d 200, 203.

We begin by addressing two questions of law determined by the court and affecting the causes of actions allowed to go to the jury against Collins.

### A. Choice of Law

■ Bell asserted below that the sales contract was a Texas contract and that the substantive law of Texas was therefore the proper law to apply to determine the rights and liabilities of the parties. The trial court determined that Oklahoma law applied. Bell argues that 15 O.S. 1971, § 162 controls this determination. Section 162 is the general statute for choice of law to be applied in determining the validity of a contract. Bell also argues that the sale of the transmitter was a "sale of goods," making it a commercial transaction covered by the Uniform Commercial Code. This is a correct assertion, and one with which Collins and this Court agree. Because this is a sale of goods, the rights and liabilities of the parties are specifically governed by Article 2 of the Code, but the general provisions of Article 1 are applicable to all the other Articles. Both Texas and Oklahoma have adopted the Code provisions of Articles 1 and 2. Tex.Bus. & Com.Code Ann. tit. 1, §§ 1.101 to 2.725 (Vernon 1968); 12A O.S. 1971, §§ 1–101 to 2–725 (hereinafter cited by U.C.C. section number only). The Code provides its own choice of law rule in section 1–105. The Texas statute is identical to the Oklahoma statute. Just as the Oklahoma Supreme Court found in *Sesow v. Swearingen*, 552 P.2d 705, 706–07, that when a sale of goods is involved the statute of limitation in § 2–725 supersedes the general statute of limitations, 12 O.S. 1971, § 95 (Second), we find that the choice of law rule in section 1–105 supersedes the general contract choice of law rule found at 15 O.S. 1971, § 162.

■ The Oklahoma Supreme Court has not had an opportunity to interpret section 1–105(1). But see *Williams v. Texas Kenworth Co.*, 307 F.Supp. 748, 753 (W.D.Okla. 1969). The statute allows the parties to agree to apply the law of a state that bears a reasonable relationship to the transaction. Absent such an agreement the statute's directive is that "this Act applies to transactions bearing an *appropriate relationship* to this state." [Emphasis added.]

Thus, the threshold question becomes what relation is appropriate. Comments 2 and 3 to section 1–105 offer some guidance:

2. Where there is no agreement as to the governing law, the Act is applicable to any transaction having an "appropriate" relation to any state which enacts it. Of course the Act applies to any transaction which takes place in its entirety in a state which has enacted the Act. But the mere fact that suit is brought in a state does not make it appropriate to apply the

substantive law of that state. Cases where a relation to the enacting state is not "appropriate" include, for example, those where the parties have clearly contracted on the basis of some other law, as where the law of the place of contracting and the law of the place of contemplated performance are the same and are contrary to the law under the Code.

3. Where a transaction has significant contacts with a state which has enacted the Act and also with other jurisdictions, the question what relation is "appropriate" is left to judicial decision. In deciding that question, the court is not strictly bound by precedents established in other contexts. Thus a conflict-of-laws decision refusing to apply a purely local statute or rule of law to a particular multistate transaction may not be valid precedent for refusal to apply the Code in an analogous situation. Application of the Code in such circumstances may be justified by its comprehensiveness, by the policy of uniformity, and by the fact that it is in large part a reformulation and restatement of the law merchant and of the understanding of a business community which transcends state and even national boundaries. [Citations omitted.] In particular, where a transaction is governed in large part by the Code, application of another law to some detail of performance because of an accident of geography may violate the commercial understanding of the parties.

Only two states have any relationship to this transaction, Oklahoma and Texas. This, however, does not aid in determining which state has an *appropriate* relation. Comment 3 tells us the contacts must be significant, and if significant the question of whether the contacts constitute an appropriate relation is a matter for judicial decision. For now it is enough to say that both Oklahoma and Texas bear an appropriate relation to the transaction. Again, this does not aid us in making the proper choice of law, because neither the statute nor the comments direct which state's substantive law is to be applied when either (1) the forum does not bear an appropriate relation to the transaction, or, as here, (2) there are two or more jurisdictions that bear appropriate relations to the transactions and *all* have enacted the Act. However, the Comments set out above indicate that the choice of law decision should have a rational basis and lead to predictability in multistate commercial law litigation.

◼ Choice of law rules in all areas of the law have undergone considerable changes as our society has grown and become more transient. In 1974 the Oklahoma Supreme Court re-evaluated its long-used choice of law rule with respect to an action in tort. In *Brickner v. Gooden*, 525 P.2d 632, the Court followed the lead of other progressive jurisdictions and adopted the "most significant relationship" test of the Restatement (Second) of Conflict of Laws § 145 (1971), determining that the traditional rule that the substantive rights of the parties in a tort action were to be governed by the law of the place of the wrong had outgrown its usefulness. The "most significant relationship" test evaluates contacts relevant to the law theory alleged and allows a court to select the substantive law to be applied on a rational basis. Consequently, instead of the automatic application of a body of substantive law, which may only have a fortuitous relationship to the action, the evaluation process leads to an appropriate choice of law. The appropriate choice of law is the substantive law of the state most directly connected to the parties and the transaction, and, therefore, the state with the most interest in having its law applied. *See generally* Nordstrum & Rammerman, *The Uniform Commercial Code and the Choice of Law*, 1969 Duke L.J. 623, 643–44; Note, 40 Geo.Wash.L.Rev. 797 (1971–1972).

◼ Oklahoma has determined in the area of torts that the "most significant relationship" test is a better means of determining which jurisdiction's law will apply. The same rationale for accepting the doctrine as to torts dictates that its applica-

tion should be made to actions that fall under Article 2 of the Uniform Commercial Code. The "most significant relationship" test will allow application of the law of the jurisdiction most intimately connected to the issues involved. The adoption of this test complies with and carries out the directive of section 1–105 that the law chosen bear an appropriate relation to the transaction.

 We are guided by the rules of the Restatement (Second) of Conflict of Laws. Generally with respect to issues in contract litigation the contacts to be evaluated according to their relative importance to a particular issue are: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. Restatement (Second) of Conflict of Laws § 188(2), at 575 (1971) (hereinafter cited by *Restatement* section number only). But a contract to sell interests in a chattel is a particular type of contract, which receives a different treatment. Comment c to section 191 states that "[s]ubstantive rules applicable to the contracts in this section are stated in Article 2 of the Uniform Commercial Code." Section 191 states:

> The validity of a contract for the sale of an interest in a chattel and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where under the terms of the contract the seller is to deliver the chattel unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

So in a contract for the sale of goods the most significant contact is the place of delivery unless another state has a more significant relationship. Comment e to section 191 sets forth the reasons for applying the law of the place of delivery. It reads in pertinent part:

> Several factors serve to explain the importance attributed by the rule to the place of delivery. Delivery is the most significant stage of the sales transaction. It marks the point where the seller has fulfilled at least his major obligations under the contract. Delivery is also the point where in the case of fungible or generally described goods, the actual subject matter of the transfer will usually first become identified. So in the case of a contract for the sale of one thousand bushels of wheat, the specific grains of wheat with which the seller intends to fulfill his obligation under the contract do not become identified until they have been produced by the seller at the place of surrender. The rule also furthers the values of certainty, predictability and uniformity of result and, since the state where the delivery of the chattel is to be made will usually be readily ascertainable, of ease in the determination of the applicable law.

Comment f to section 191 explains its "unless" provision. It reads in pertinent part:

> On occasion, a state which is not the place of delivery will nevertheless, with respect to the particular issue, be the state of most significant relationship to the transaction, the parties and the chattel and hence the state of the applicable law. This may be so, for example, *when the contract contemplates a continued relationship between the parties which will be centered in a state other than that where delivery took place.* [Emphasis added.]

 In this case Collins is the seller, and the terms of delivery in the contract call for delivery "f. o. b. the place and location of Collins' factory from which Collins elects to make shipment." The facts reveal that delivery was f. o. b. Dallas, Texas. Thus, the law of Texas would apply under the most significant contact theory if the "unless"

provision of section 191 does not come into play.

Oklahoma has the following significant contacts with the transaction: (1) the place of contract negotiation; (2) the place of performance; (3) the place where all alleged oral warranties were made; (4) the domicile of Bell; and (5) the place of location of the subject matter of the contract. Texas, in addition to being the place of delivery, was the place of contracting and the principal place of business of Collins.

Although the general rule would make the law of the place of delivery the applicable substantive law in a dispute concerning a sale of goods, the facts of this case bring it within the "unless" provision of section 191. Clearly, the sales contract contemplated a continuing relationship between the parties, and that relationship would be centered in Oklahoma. The transmitter or the "good" is not the type of equipment that parties to a contract would contemplate to be mobile. Once installed it would remain stationary. Collins offers field service and advice to stations as part of its promotional materials and that, of course, would be a continuing relationship centered at the place of location of the equipment. *Cf.* Restatement (Second) of Conflict of Laws § 191, Comment f, Illustration 5 (1971). We believe the comprehensive evaluation of contacts adopted herein would lead a Texas court to the same decision just reached. The determination is in keeping with the purposes for which the Code was written. *See generally* § 1–102.

The trial court did not err in applying the law of Oklahoma. Since we reach this decision under the authority cited herein, it is unnecessary to determine whether Bell is entitled to treble damages, which *might* have been appropriate under the Deceptive Trade Practices and Consumer Protection Act, Tex.Bus. & Comm.Code Ann. tit. 4, §§ 1741–1763 (Vernon Supp.1980).

*B. Disclaimer of Warranties/Limitation of Remedies*

Throughout this litigation it has been Collins' contention that the obligations under the written sales contract were the sum total of all the obligations flowing between Collins and Bell. Collins asserts that it effectively disclaimed all implied warranties and all express warranties save the one stated on the face of the contract. It also asserts that it effectively limited Bell's damages to repair or replacement of "properly maintained equipment, parts or accessories which are defective as to design, materials or workmanship. . . ." The contract also included an incorporation clause providing that the contract contained "all the terms, conditions and agreements of the parties." The trial court ruled that the language of Paragraph 8 of the contract was not binding because it was not conspicuous. Paragraph 8 was captioned "GUARANTEE" and contained the disclaimer of warranties clause and the limitation of remedies clause in separately stated paragraphs. The court also found that under the evidence the incorporation clause was not binding.

The contract in question is a one-page form contract prepared by Collins. It expressly warrants "that any radio transmitter described herein will deliver full radio frequency output at the antenna lead when connected to a suitable load. . . ." Following the express warranty is the disclaimer of warranties clause, which is printed all in capital letters, but is of the same type size as the rest of the contract. It reads:

NO OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR INTENDED PURPOSE, SHALL BE APPLICABLE TO ANY EQUIPMENT SOLD HEREUNDER.

This paragraph is followed by the limitation of remedies clause, which reads:

THE FOREGOING SHALL CONSTITUTE THE BUYER'S SOLE RIGHT AND REMEDY UNDER THE AGREEMENTS IN THIS SECTION. IN NO EVENT SHALL COLLINS HAVE ANY LIABILITY FOR CONSEQUENTIAL DAMAGES, OR FOR LOSS, DAMAGE

OR EXPENSE DIRECTLY OR INDIRECTLY ARISING FROM THE USE OF THE PRODUCTS, OR ANY INABILITY TO USE THEM EITHER SEPARATELY OR IN COMBINATION WITH OTHER EQUIPMENT OR MATERIALS, OR FROM ANY OTHER CAUSE.

 The disclaimer of warranties clause and the limitation of remedies clause are two separate and distinct entities and are governed by different provisions of the Code. Yet, the trial court grouped them together and treated them alike. A disclaimer of warranties is a means of controlling the liability of the seller by reducing the number of situations in which a seller can be in breach of contract terms. A limitations of remedies clause, on the other hand, simply restricts the remedies available to the seller, the buyer, or both once a breach is established. *See generally* J. White & R. Summers, Uniform Commercial Code § 12–11 (2d ed. 1980).

 The express warranty made by Collins is valid, and Collins has not even attempted to disclaim it. Collins has, however, attempted to disclaim *all other warranties*, express and implied. Such a disclaimer is effective under the U.C.C. if properly executed. An effective disclaimer of a warranty of merchantability may be written or oral. In either case, the disclaimer must contain the term merchantability, and if it is in writing the writing *must be* conspicuous. An effective disclaimer of a warranty of fitness must *always* be in writing and conspicuous. § 2–316(2).

Section 1–201(10) defines "conspicuous" and makes the determination of whether a term or clause comes within the definition a question of law for the court. The section reads in pertinent part:

Conspicuous: A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON–NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous".

The question of whether a purported disclaimer complied with the section 2–316 conspicuous provision was addressed by the Oklahoma Supreme Court in *P. E. A. C. E. Corp. v. Oklahoma Natural Gas Co.*, 568 P.2d 1273. The disclaimer provision of the contract failed because it did not mention merchantability, and it was not conspicuous for the following reasons, 568 P.2d at 1278:

It is not in capital letters or in a large or different colored type. It is on the back of the contract. The heading makes no indication the provisions include an exclusion of warranties. Although none of these factors standing alone necessarily will invalidate a disclaimer clause, the combination of all these factors plus the lack of evidence Corporation had actual notice RS&E was excluding all warranties, leads us to hold the attempted exclusion of warranties in the contract was not effective. [Footnotes omitted.]

We find no other Oklahoma cases on point. Section 1–201(10) does give guidance as to what shall be construed as conspicuous, but it is important to note that comment 10 to that section states that the methods listed therein are only *some* of the methods a seller may use to make the terms of clauses "attention calling." Comment 10 then states "the test is whether attention can reasonably be expected to be called to it."

 The test for "conspicuous" requires an evaluation of many factors. Bell argues that because the disclaimer was on the reverse side of the one-page contract, it was not conspicuous. It is true the disclaimer was on the reverse side of the contract. Some courts in invalidating disclaimers have listed the fact that it appeared on the reverse side as a factor in finding that

the provision was not conspicuous. *Massey Ferguson, Inc. v. Utley*, 439 S.W.2d 57, 59 (Ky.Ct.App.1959) (disclaimer on reverse side and language directing attention to it on front was in ordinary type); *Hunt v. Perkins Machinery Co.*, 352 Mass. 535, 226 N.E.2d 228, 232 (1967) (disclaimer on reverse side, concealed because on a carbon pad when signed, no reference on front to terms on back, and buyer's first opportunity to see reverse side was when contract was returned to him after being accepted by the seller); *Christopher v. Larson Ford Sales, Inc.*, 557 P.2d 1009, 1012 (Utah 1976) (disclaimer on back *but also* in fine print). However, in *Childers v. Sowards*, 460 S.W.2d 343, 344 (Ky.Ct.App.1970), the Kentucky court stated that its decision in *Massey Ferguson, supra,* was not based solely on the fact that the disclaimer was on the reverse side, but, additionally, because it appeared in the same size type and face as the other contents of the contract. It would appear that the better view is not to invalidate a disclaimer simply because of its particular location on a contract if it is otherwise in compliance with the conspicuous provision. Location of the disclaimer should be but one of the factors used to determine if the disclaimer is "so written that a reasonable person against whom it is to operate ought to have noticed it." § 1–201(10); R. White & J. Summers, Uniform Commercial Code § 12–5, at 442–43 (2d ed. 1980).

Recent decisions have validated disclaimer clauses by considering many relevant factors, including location in the contract, type face and type size, variation in the printing, length of the contract, and the sophistication of the buyer. *Tennessee Carolina Transportation, Inc. v. Strick Corp.*, 283 N.C. 423, 196 S.E.2d 711, 718 (1973) (in dicta, the court stated that although disclaimer did not come within the definition of conspicuous, where buyer is sophisticated, has bargaining power, and is aware of such disclaimers, the purpose of the conspicuous requirement is met, relying on the language of comment 1 to § 2–316, which reads "or other circumstances which protect buyer from surprise"); *Avenell v. Westinghouse Electric Corp.*, 41 Ohio App.2d 150, 324 N.E.2d 583, 586–87 (1974) (contract contained no fine print, disclaimer was introduced by words in all capital letters although the disclaimer itself was in same print as rest of contract, language was simple and direct, and person it operated against was a sophisticated entity); *Atlas Mutual Ins. Co. v. Moore Dry Kiln Co.*, 38 Or.App. 111, 589 P.2d 1134, 1136 (1979) (disclaimer introduced by capital letters although provisions of disclaimer were in regular type. Court stated that courts are reluctant to uphold exculpatory clauses, but such a limitation should be upheld between businessmen who have dealt with each other at arm's length in a commercial setting); *W. R. Weaver Co. v. Burroughs Corp.*, 580 S.W.2d 76, 81 (Tex.Civ.App.1979) (term merchantability mentioned, disclaimer in separate paragraph with all words capitalized. The court did not refer to the location of the clause or the length of the contract); *Thermos King Corp. v. Strick Corp.*, 467 F.Supp. 75, 78 (W.D.Pa.1978) (disclaimer was on the reverse side, but was the only language in all capital letters); *Gilbert & Bennett Manufacturing Co. v. Westinghouse Electric Corp.*, 445 F.Supp. 537, 547 (D.Mass.1977) (disclaimer was on front of contract, in large type, readable, simple to understand, and "person" against whom it operated is sophisticated); *Fargo Machine & Tool Co. v. Kearney & Tricker Corp.*, 428 F.Supp. 364, 372 (E.D.Mich.1977) (disclaimer did not fit conspicuous criteria, but the court found that since the contract was only one page and the warranty section mentioned warranty, the actual exclusionary wording did not need to be conspicuous, relying on comment 1 to section 2–316); *American Electric Power Co. v. Westinghouse Electric Corp.*, 418 F.Supp. 435, 451 n. 22 (S.D.N.Y.1976) (court held disclaimer valid even though in same type face as rest of contract, stating in footnote 22 that it "strains credibility to suggest plaintiffs had not noticed or were unaware of exclusions of implied warranties," relying on fact both parties were sophisticated business entities).

We find that the disclaimer in this case is conspicuous. It appears on the reverse side of a single sheet contract. It appears in all capital letters in a separate paragraph and is the only language in capitals on the page save the section headings and the limitation of remedies clause. Reference is made on the front to the terms of the contract appearing on the back. Although the reference is in smaller type than all other terms on the front of the contract, it is easily read, amply spaced, set off by horizontal lines, and appears just above the space provided for the buyer's signature. Additionally on the front appears, "COLLINS EQUIPMENT CARRIES A TWO YEAR WARRANTY," in typewritten language. These two entities by their own testimony are sophisticated business concerns, so such a reference on the front, coupled with the language directing the buyer to the terms on the back is sufficient to call the buyer's attention to the terms of the warranty, including the disclaimer section. Bell received a copy of the contract at the time of signing. Before delivery of the transmitter, Collins provided him with at least two operator's manuals for the transmitter. On the inside front cover of each of these manuals in large bold face type is written "BROADCAST EQUIPMENT GUARANTEE," and the provisions of the contract which are in question are set forth in language identical to that appearing in the contract. We find that *in this case, upon these facts*, the disclaimer is conspicuous within the meaning of section 1–201(10) and is valid against Bell. The trial court found differently, but with regard to the question of conspicuousness an appellate court, with the contract before it, is in as good a position to determine the issue as the trial court. *See Hunt v. Perkins Machinery Co., Inc.*, 352 Mass. 535, 226 N.E.2d 228, 231 (1967). We note that the disclaimer is of *minimal* compliance, and we do not venture to state what factors might alter this determination in future cases outside of the sophistication of the buyer.

The limitation of remedies clause is also effective. Section 2–316(4) expressly allows contracting parties to limit their remedies. Section 2–719 lays down the ground rules for such a provision. This section *does not* require that the limitation of remedies be conspicuous, although under the authority cited in this case, it was. When a seller limits a buyer's remedies, he takes the chance that the remedy will fail of its essential purpose. § 2–719(2). In other words, if the seller delivers defective goods and limits buyer's recovery to repair or replacement of defective parts, as was done here, and repeated attempts to repair fail, then the remedy fails of its essential purpose. *See Beal v. General Motors Corp.*, 354 F.Supp. 423, 426 (D.Del.1973); *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349, 356 (Minn.1977). When the remedy fails of its essential purpose, a buyer can resort to all other remedies available to him under the code.

In this case Collins has precluded Bell from recovering consequential damages unless Bell can prove the limitation was unconscionable or the remedy failed of its essential purpose. It is prima facie unconscionable to limit damages "for injury to the person in the case of consumer goods," but where the loss is commercial it is not. § 2–719(3). The evidence shows neither unconscionability nor failure of the essential purpose of the remedy. The trial court found neither of these conditions, but struck the clause because it was not conspicuous. This was error, and we find the clause is valid and effective against Bell.

We note here an important concept not argued by either party but applicable with regard to when a buyer is entitled to consequential damages for a seller's breach. A buyer's damages for breach are stated in section 2–714. Paragraph 3 of that section states "In a *proper case* any incidental and consequential damages under the next section [2–715] may also be recovered." (Emphasis added.) Section 2–715(1) provides for recovery of incidental damages resulting from seller's breach, and 2–715(2)(a) provides for consequential damages which include:

[a]ny loss resulting from general or particular requirements and needs of which

the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and . . . .

Comment 2 to section 2–715 provides the test for this recovery:

Subsection (2) operates to allow the buyer, in an appropriate case, any consequential damages which are the result of the seller's breach. The "tacit agreement" test for the recovery of consequential damages is rejected. Although the older rule at common law which made the seller liable for all consequential damages of which he had "reason to know" in advance is followed, the liberality of that rule is modified by refusing to permit recovery unless the buyer could not reasonably have prevented the loss by cover or otherwise. *Subparagraph (2) carries forward the provisions of the prior uniform statutory provision as to consequential damages resulting from breach of warranty, but modifies the rule by requiring first that the buyer attempt to minimize his damages in good faith, either by cover or otherwise.* [Emphasis added.]

In this case Bell testified that it was possible for him to replace the Collins transmitter with another (cover), but he did not. Instead he continued to use it without paying for it, because he felt someone ought to pay for his downtime. Thus even if the limitation of remedies clause was ineffective, Bell's actions with regard to the goods may very well have precluded recovery of consequential damages. We need not reach this question, however, because of the present disposition of this case.

*C. Breach of Warranty*

█ Collins argues that section 2–202, the parol evidence rule of the U. C. C., precluded the trial court from admitting testimony that contradicted the agreed upon terms of the contract, because it contained a merger or incorporation clause evidencing that the terms of the contract were intended by the parties to control their respective rights and liabilities. Generally, carefully worded incorporation clauses are effective to preclude evidence of prior or contemporaneous agreements as to terms contained in the written contract under section 2–202, unless the judge made exceptions to the parol evidence rule of fraud, misrepresentation or mistake are present. *See* J. White & R. Summers, Uniform Commercial Code § 2–12, at 89–91 (2d ed. 1980).

The determination of the relevancy of section 2–202 to this case is not necessary. This is so because even if we assume the trial court's finding that the disclaimer was invalid was correct, the whole of Bell's evidence viewed in the light most favorable to him fails to establish the necessary elements of breach of warranty to entitle him to a recovery.

█ To recover on a theory of breach of warranty a party must show that a warranty exists, the warranty was breached, and that the breach was the proximate cause of the loss suffered. § 2–314, comment 13; *Chisholm v. J. R. Simplot Co.*, 94 Idaho 628, 495 P.2d 1113 (1972); *Collum v. Fred Tuch Buick*, 6 Ill.App.3d 317, 285 N.E.2d 532 (1972); *Scheuler v. AAMCO Transmission, Inc.*, 1 Kan.App.2d 525, 571 P.2d 48 (1977); 77 C.J.S. *Sales* § 365. Our Supreme Court has impliedly held as much in two cases. *Chaplinski v. Gregory*, 559 P.2d 1244; *Wickware v. National Mortgage Corp.*, 570 P.2d 330.

The case was tried on theories of breaches of express warranties and implied warranties. The express warranty in the contract was that the transmitter would broadcast when connected to a suitable load. Bell alleged additional oral warranties of workmanship, design and materials, appearance, dimensions, maintenance, and operation. We have found the implied warranties of merchantability and fitness for a particular purpose were effectively disclaimed. However, even if they were not, the evidence presented removed the warranties from consideration by the jury.

█ We start with the premise that there were warranties. The express war-

ranties and the implied warranty of merchantability will be discussed together under the facts of this case, because in essence they both warrant that the transmitter will conform to its description and be fit for its intended purpose. This is crucial because even though we have found the implied warranty of merchantability to be effectively disclaimed, the express warranty contained in the contract is valid and has not been disclaimed. We point out here that there was abundant testimony about the transmitter not having doors as the one shown Bell in the catalogue and that the dimensions were inaccurate. Even if these are considered "warranties" Bell showed no damage resulting from these shortcomings, so the proof failed.

■ To recover for a breach of the implied warranty of merchantability a plaintiff must prove: (1) a sale of goods by a merchant, (2) the goods were not "merchantable" at the time of sale, (3) injury and damage to the plaintiff or his property proximately caused by the defective nature of the goods, and (4) appropriate notice of breach to the seller. J. White & R. Summers, Uniform Commercial Code § 9–6, at 343 (2d ed. 1980).

■ Merchantability has been defined in Oklahoma to mean of a quality generally sold in the market place and suitable for its intended purpose even if not of the best quality. *Wickware v. National Mortgage Corp.*, 570 P.2d 330, 332; *Wallace v. L. D. Clark & Son*, 74 Okl. 208, 174 P. 557, 558.

■ The U. C. C. does not require a buyer to prove that he relied on the assertions constituting a warranty when the warranty is express (§ 2–313, comment 3) or is an implied warranty of merchantability (§ 2–314). *Interco, Inc. v. Randustrial Corp.*, 533 S.W.2d 257 (Mo.Ct.App.1976); J. White & R. Summers, Uniform Commercial Code § 9–4 (2d ed. 1980). However, some jurisdictions impose this condition on a plaintiff citing the U. C. C. but apparently relying on common law directives. *Hrosik v. J. Keim Buildings*, 37 Ill.App.3d 352, 345

N.E.2d 514 (1976); *General Supply & Equipment Co. v. Phillips*, 490 S.W.2d 913 (Tex.Ct.Civ.App.1972).

■ In *Tuttle v. Kelly-Springfield Tire Co.*, 585 P.2d 1116, the Oklahoma Supreme Court stated that "the absence of a defect . . . is irrelevant to the question of liability in an action for breach of warranty under the Code . . . whether it is implied by law or expressly created by the seller." 585 P.2d at 1120. In that case the seller had warranted a tire against blowouts, and the tire sustained a blowout. The tire did not perform as warranted, thus it was unnecessary there to prove a specific defect or the presence of any defect, but generally *one cannot recover for breach of warranty unless he can prove that the good did not perform as warranted. Scheuler v. AAMCO Transmission Inc.*, 1 Kan.App.2d 525, 571 P.2d 48, 52 (1977); *McCarty v. E. J. Korvette, Inc.*, 28 Md. 421, 347 A.2d 253, 265–66 (1975).

■ The question is, does the evidence presented reveal that the transmitter sold by Collins did not perform as warranted? *It does not.* The evidence conclusively shows that when the transmitter received the correct input load it operated as warranted. Thus there can be no breach of an express warranty or the implied warranty of merchantability. Admittedly the station was off the air. The evidence shows that the transmitter failed to work when, for whatever reason, it was supplied with voltage outside of the express limits within which it was warranted to perform. Several theories were presented for the cause of the overvoltage. They were: a defective auxiliary generator provided by Garner, malfunction of the Rotoverter provided by Garner, malfunction due to lightning striking the broadcast facility, power shortage caused by R. E. A., and employee error. Bell's witnesses all testified that they did not know what caused it, but they knew that at such times the transmitter failed to work. The testimony of Dan Wynn, who was called by Collins because he did required performance tests for the station in

February of 1976 and again in December of that same year, was undisputed. He was a qualified expert and consultant with regard to radio broadcasting equipment. Mr. Wynn found no defective parts in the transmitter or that the transmitter was in need of repair on either inspection. Bell put on absolutely no evidence to show that the downtime was proximately caused by the transmitter. The transmitter has performed as warranted since it was first installed and was operating at the time of trial, showing 24,000 hours of transmission. The sum total of all the evidence on these issues shows but one thing—the station was off the air. That is not enough to impose liability upon Collins.

■ We note here that Collins did replace some defective parts in the transmitter. Once goods are accepted, no breach results because a product has defective parts if they are replaced within a reasonable time under the limited remedy of repair and replacement. There was lengthy testimony that Collins refused to replace an allegedly defective stereo generator. At the time of Collins' refusal, Bell was not paying on the contract. In fact, he had been in arrears for over a year, and was threatening to return the transmitter. Under section 2–609(1), comment 1, and 2–610(c) Collins' actions were most likely justifiable. But in any event Collins did supply a stereo generator without cost, while Bell has never paid for the transmitter, which is performing and has always performed when connected to a suitable load. The failure to replace the stereo generator caused no downtime, and the evidence fails to show how the failure to supply the generator damaged Bell. Thus, there can be no recovery for failure to replace the generator.

■ The next question is whether there was sufficient evidence that an implied warranty of fitness for a particular purpose arose, which Collins breached. Again, we have found that this warranty was effectively disclaimed, removing it from jury consideration, but even if it were not, Bell's evidence failed. In addition to the general elements a party must prove for any breach of warranty, section 2–315 requires that the plaintiff show the seller had reason to know of a particular purpose for which the goods were to be used, and that the buyer relied on the seller's skill and judgment in selecting a suitable good.

■ The evidence construed in the light most favorable to Bell reveals the following course of events. Bell decided to increase the power of his FM radio station. To effectuate this aim he had to purchase a new FM transmitter. He, on his own initiative, secured bids from three different suppliers, one of which was Collins. Bell testified that all FM transmitters of the type he desired used three-phase electricity. He informed each supplier that he only had one-phase electricity available to him. Bell testified that he accepted Collins' bid, even though it was not the lowest bid, because Collins' factory was closer to Poteau, Oklahoma, than the factories of the other two suppliers. Bell further testified that the Collins' salesman had stated if he purchased the transmitter from Collins, his personnel could travel to Collins' factory and be instructed in the operation of the transmitter prior to delivery. Prior to signing the sales contract, Bell testified he solicited bids from Collins on two other pieces of equipment, an auxiliary generator and a piece of equipment which would convert the available one-phase electricity to three-phase. *But also prior to signing the contract*, he made a business decision to obtain the additional equipment from Garner. Bell testified that Garner had informed him that the Rotoverter could accomplish the desired result, and Bell entered into a contract with Garner for construction of the buildings to house the broadcasting equipment and for the sale and placement in the facility of the Rotoverter. Collins supplied operator's manuals for the transmitter to both Bell and Garner. These manuals expressly set forth the voltage limits of the transmitter, and Collins advised Bell and Garner that they had to be specifically met. All this

was done prior to delivery of the transmitter. The evidence showed Collins does not install this type of equipment, it only supplies it. Collins provided Bell with the names of three men, who were qualified to install the transmitter and connect it to the Rotoverter. Bell selected John Shideler, who was made a party to this suit but was dismissed prior to trial. Bell and Bell's counsel tried repeatedly to state by innuendo that Shideler was an employee of Collins and a part of the overall contract, but this is not the case. Clearly, Shideler was an independent contractor, and was selected by Bell without pressure from Collins. Collins provided personnel to be present at the time of hookup, but such personnel was not provided to perform installation, only to check the transmitter.

Thus, we have a businessman expanding his operational base and putting together a larger FM station with greater broadcasting range. Bell's testimony was that he has considerable knowledge in the business of operating radio stations due to 27 years of experience. Unquestionably, the new enterprise was less than a true business success story. Bell's logs revealed that the station had been off the air for a total of 150 days from its inception in July of 1974 through the trial in April of 1977. Testimony revealed that 150 days is excessive downtime, and such downtime is detrimental to the profitability of the radio station. What the evidence does not reveal is that Bell relied on Collins' judgment in selecting the transmitter or that Collins ever warranted that its transmitter would operate effectively with the Rotoverter. In fact though Bell alleged the all encompassing warranty as to Collins, it stated in its third proposition in its brief in chief challenging the verdict for Garner, that "Garner installed the Rotoverter phaseconverter and the specifications supplied by Collins called for a Phasemaster phaseconverter. The independent action of Garner created some of the problems described herein." No seller of goods can warrant that purchasing his particular goods will insure the success of the buyer's business endeavor. And no warranty for a particular purpose arose, because Bell relied on his own judgment, not that of Collins. Bell knew what equipment he desired when he approached Collins, and Collins supplied it.

With our disposition of this case the judgment for Bell is reversed and the attorney's fees granted thereunder to Bell are set aside. The directed verdict for Collins and the attorney's fees granted thereunder are affirmed, and the jury verdict for Garner is affirmed.

Motion for oral argument of Appellant, Collins Radio Company of Dallas, Texas, is denied.

REVERSED IN PART, and AFFIRMED IN PART.

REYNOLDS, P. J., and BOX, J., concur.